7 U.S. 210
 3 Cranch 210
 2 L.Ed. 414
 HALLET AND BOWNE
v.
JENKS AND OTHERS.
 February Term, 1805
 
 1
 THIS was a writ of error to 'The court for the trial of impeachments and correction of errors, in the state of New-York,' under the act of congress, of the 24th September, 1789, § 25, vol. 1, p. 63, which gives the supreme court of the United States, appellate jurisdiction upon a judgment in the highest court of a state, in which a decision in the suit could be had, where is drawn in question, the construction of any clause of a statute of the United States, and the decision is against the right, privilege or exemption, specially set up or claimed by either party, under such statute.
 
 
 2
 The action was upon a policy of insurance, and the only question to be decided by this court was, whether the risk insured was illegal, under the act of congress (commonly called the non-intercourse law) of the 13th June, 1798, vol. 4, p. 129. For, although another question appears to arise upon the record, viz. whether a condemnation in a foreign court, as enemy's property, be conclusive evidence of that fact, yet this court is prohibited by the same 25th section of the act of 1789, to consider any other question than that which respects the construction of the statute in dispute.
 
 
 3
 On the trial of the general issue, a special verdict was found, containing the following facts:
 
 
 4
 That on the 27th day of April, 1799, the defendants, for a premium of 25 per cent, insured for the plaintiffs, against all risks, 1,000 dollars, upon twenty-five thousand pounds weight of coffee, valued at 20 cents per pound, on board the sloop Nancy, from Hispaniola to St. Thomas. That in the margin of the policy was inserted a clause in the following words: 'warranted the property of the plaintiffs, all Americans,' but that the words all Americans, were added after the policy was subscribed; that the sloop Nancy was built at Rhode-Island, and belonged to citizens of the United States, resident in Rhode-Island, as well when she left that state as at the time of her capture, and, being chartered by the plaintiffs, sailed from New-Port, in Rhode-Island, on the 12th day of December, in the year 1798, on her first voyage to the Havanna; that in the course of the said voyage, she was compelled, being in distress, to put into Cape-Francois, in the island of Hispaniola, a country in the possession of France, where she arrived on the 5th day of January, 1799; that the captain and supercargo of the sloop were part owners of the Cargo, and are two of the plaintiffs in this suit; that having so put into Cape-Francois, the cargo was landed to repair the vessel; that the public officers, acting under the French government there, took from them nearly all the provisions on board the sloop, and the captain and supercargo were permitted to sell, and did sell, the remainder to different persons there; that the captain and supercargo made a contract with the public officers, by which, they were to be paid for the provisions in thirty days, but the payment was not made; that, with the proceeds of the remaining parts of the cargo, they purchased the whole of the cargo which was on board at the time of the capture, and also seventeen hogsheads of sugar, which they sent home to New-York, on freight; that the said officers forbade the said master and supercargo of the sloop, from taking on board the cargo landed from the said vessel, or from conveying from the said island any specie, by reason whereof, they were compelled to sell the same, and to take the produce of that country in payment; that the sloop, with thirty thousand weight of coffee on board, twenty-five thousand pounds weight of which was intended to be insured by the present policy, sailed from Cape-Francois, on the 23d day of February, in the year last aforesaid, on the voyage mentioned in the policy of insurance, having on board the usual documents of an American vessel; that the sloop, in the course of her said voyage, was captured by a British frigate, and carried into the island of Tortola, and vessel and cargo libelled, as well for being the property of the enemies of Great-Britain, as for being the property of American citizens, trading contrary to the laws of the United States; that, at the time of the capture of the sloop, besides the documents aforesaid, the following paper was found on board: 'Liberty, Safe Conduct, Equality—At the Cape, 11th Thermidor, sixty year of French Republic, one and indivisible. The General of division and private agent of the Executive Directory at St. Domingo, requests the officers of the French navy and privateers of the Republic, to let pass freely the American vessel called the master, property of Mr. E. Born Jenks, merchants at Providence, state of Rhode-Island, in the United States, arrived from the said place to the Cape-Francois, for trade and business. The Citizen French Consul, in the place where the said vessel shall be fitted out, is invited to fill with her name, and the captain's, the blank left on these presents; in attestation of which he will please to set his hand hereupon.
 
 
 5
 (Signed) J. HEDOUVILLE.
 
 
 6
 (Signed) GAUTHIER, the General Secretary of the Agency.'
 
 
 7
 which paper was received on board the sloop at Cape-Francois, and was on board when she left that place; that the property insured by the policy aforesaid, was claimed by the said Zebedee Hunt, and was condemned by a sentence of the said court of Vice-Admiralty, in the following words: 'that the said sloop Nancy, and cargo on board, claimed by the said Zebedee Hunt, as by the proceedings, will show to be enemy's property, and as such, or otherwise, liable to confiscation, and condemned the same as good and lawful prize to the captors.' That the plaintiffs are Americans, and were owners of the property insured, and that the same was duly abandoned to the underwriters.
 
 
 8
 That part of the act of congress, which the underwriters contended had been violated by the defendants in error, is as follows:
 
 
 9
 Sec. 1. Be it enacted, &c. 'that no ship or vessel, owned, hired or employed, wholly or in part, by any person resident within the United States, and which shall depart therefrom after the first day of July next, shall be allowed to proceed, directly, or from any intermediate port or place, to any port or place within the territory of the French republic, or the dependencies thereof, or to any place in the West-Indies, or elsewhere, under the acknowledged government of France, or shall be employed in any traffic or commerce with or for any person resident within the jurisdiction or under the authority of the French republic. And if any ship or vessel, in any voyage thereafter commencing, and before her return within the United States, shall be voluntarily carried, or suffered to proceed to any French port or place as aforesaid, or shall be employed as aforesaid, contrary to the intent hereof, every such ship or vessel, together with her cargo, shall be forfeited, and shall accrue,' & c.
 
 
 10
 Sec. 2, enacts, that atter the first of July, 1798, no clearance for a foreign voyage shall be granted to any ship or vessel, owned, hired or employed, wholly or in part, by any person resident within the United States, until a bond shall be given, in a sum equal to the value of the vessel and cargo, 'with condition, that the same shall not, during her intended voyage, or before her return within the United States, proceed or be carried, directly or indirectly, to any port or place within the territory of the French republic, or the dependencies thereof, or any place in the West-Indies, or elsewhere, under the acknowledged government of France, unless by distress of weather, or want of provisions, or by actual force or violence, to be fully proved and manifested before the acquittance of such bond; and such such vessel is not, and shall not be employed, during her intended voyage, or before her return, as aforesaid, in any traffic or commerce with or for any person resident within the territory of that republic, or in any of the dependencies thereof.' June 13th, 1798. Vol. 4, p. 129.
 
 
 11
 Mason, for the plaintiffs in error. If the insurance was upon an illegal transaction, the defendants in error have no right to recover. The only question for the consideration of this court is, whether it be a transaction prohibited by the act of congress. If the purchase of this cargo in Cape-Francois was lawful, the policy is good.
 
 
 12
 The first section of the act has two branches, and contemplates two separate offences—1st. That no vessel shall be allowed to go to a French port. But this prohibition must be subject to the general principle, that the act of God, or of the public enemy, shall be an excuse.
 
 
 13
 2d. That if driven into such port by distress, or involuntarily carried in, yet, there shall be no trade or traffic.
 
 
 14
 The words are, 'if any vessel shall be voluntarily carried, or suffered to proceed to any French port or place as aforesaid, or shall be employed as aforesaid.' The going in must be voluntary, but the legislature carefully omit the word voluntarily, when speaking of the offence of trading; for all trading must be voluntary; it cannot be by compulsion. The object was to prevent intercourse, and the statute only makes the same saving of the forfeiture, which a court would have been without such a saving clause.
 
 
 15
 The condition of the bond mentioned in the 2d section, confirms this construction of the 1st. It is divided into two clauses, agreeably to the two offences to be provided against. The proviso, 'unless by distress of weather,' &c. is annexed only to the offence of going into the port, but there is no savings or exception as to the offence of trading.
 
 
 16
 If she had not been driven in by distress of weather, she would have been liable to forfeiture under the first offence. But having been employed in traffic with persons resident, &c. she is equally liable to forfeiture under the second, and the condition of the bond has been substantially broken.
 
 
 17
 The special verdict states, 'that the captain and supercargo were permitted to sell, and did sell the residue of the cargo to different persons there.' Here was no compulsion. This selling was a violation of the law; but it is not that which avoids this policy. The fault was, that with the proceeds of those sales, the plaintiffs below purchased the cargo insured. There was no compulsion to do this, except what I shall presently notice, as stated in the verdict. It will robaby be contended that the following words of the verdict show a compulsion, viz. 'that the said officers forbade the said master and supercargo from taking on board the cargo landed from the said vessel, or from conveying from the said island any specie, by reason whereof, they were compelled to sell the same, and to take the produce of that country in payment.' But this is only the reasoning of the jury, and the words, by reason whereof, show what kind of compulsion it was, and that it was not that inevitable necessity which can excuse the express violation of the law. The owners ought to have said to them, if you forbid us to take away or our property, we must leave it, and look to our government for an indemnification; for they have forbidden us to sell it to you, or to purchase a new cargo. The forbidding them to relade their goods, and to take away specie, was no compulsion to purchase produce. The verdict does not state that the master or supercargo attempted to resist the force; it may be wholly a colourable transaction.
 
 
 18
 The act of the 27th February, 1800, vol. 5, p. 15, shows what the construction of that of 1798 ought to be. The 3d section of the former provides, that in case the vessel shall be compelled, by distress or superior force, to go into a French port, and shall there necessarily unlade and deliver, or shall be deprived of any cargo then on board, the master may receive payment in bills of exchange, money or buillion, and not otherwise, 'and shall not thereby be understood to contravene this law.'
 
 
 19
 This is a clear implication, that if there had not been such an express permission to receive payment in bills of exchange, money or bullion, it would have been a contravention of the law; and that law, excepting this provision, is substantially the same as the law of 1798.
 
 
 20
 Harper, contra. I might safely agree to the first position taken by the opposite counsel, that the 1st section of the act of 1798 creates two distinct offences. But this is not so. The whole constitutes but one offence.
 
 
 21
 How is a ship to be employed in traffic? She must bring and carry. If she did not go voluntarily, she was not employed in trafficking. If the master sell the cargo, under such circumstances, the vessel is not employed in traffic.
 
 
 22
 But if the act creates two separate offences, how is the vessel employed in the traffic? She did not carry the cargo there voluntarily. But it being there, and landed, necessarily landed, how is the vessel concerned in the sales and purchases made by the master? The necessity of repairing the vessel is as much an excuse for landing the cargo, as stress of weather was for going in. The master was forbidden to relade it. But a difference is taken between prohibition and prevention. It is said that the forbidding is not preventing. But by whom was the prohibition? by the officers of the government, having authority and power to carry the prohibition into effect. It was, therefore, actual prevention.
 
 
 23
 What was the mischief intended to be remedied by the act of congress? Not such a sale as this. It was to prevent a voluntary intercourse, not to prevent citizens of the United States from rescuing their property from impending loss. What is traffic? A contract by consent of both parties. If one is under compulsion, it is no contract, no traffic. The transaction disclosed by the verdict is only the means of saving property from a total loss. The owners were not obliged to abandon, as the gentleman contends, property thus put in jeopardy. The master and supercargo were not free agents. They were not obliged to take bills which they knew would not be paid. If I could have had a doubt upon this case, it would have been removed by the decisions of the circuit courts of the United States. In a case before one of your honours,* in Baltimore, a vessel had brought home from the French West-Indies a cargo of the produce of those islands, after having been compelled to go in and sell her outward cargo; and it was decided, that the case was not within this act of congress. A similar case is understood to have been decided by another of your honours, in New-York. If those cases were not within the law, I am warranted in saying this is not.
 
 
 24
 Those decisions produced the 3d section of the act of 1800, which the gentleman has cited, and which was introduced to shut the door that had been left open. It was perceived, that the law, as it stood before, would give an opportunity of fraud. The 3d section was enacted to take away the temptation; because, although there might be cases clear of fraud, it was thought best to sacrifice these particular cases, that fraud might be prevented in others. This section, therefore, has given a sanction to the decisions of the circuit courts.
 
 
 25
 Key, in reply. It is clear, that there are two distinct prohibitions in the act. The two parts of the section are connected by the disjunctive 'or,' and not by the copulative, 'and.' This is rendered still more evident by the form of the condition of the bond described in the 2d section.
 
 
 26
 Whenever you rely on the necessity of the case to justify your acts, you must not go beyond the necessity. All beyond is voluntary. In this case it might go to the landing, and to the seizure of part, but not to the sale of the residue. The probability of loss is not necessity. If they took produce, it was only to avoid a greater loss. It was not an inevitable necessity.
 
 
 27
 Another fact shows that it was trading, not merely taking on board, to bring home, property which they were compelled to receive. She was not coming home with the property when she was captured, but going on a trading voyage. And the French pass states, that she came to Cape Francois for trade and business.
 
 
 28
 The intention of the act was to prevent all trading and intercourse with France or her dependencies.
 
 
 29
 In the case at Baltimore, before his honour, Judge Washington, the vessel returned directly home to Baltimore with produce, which she had been compelled to take or abandon.
 
 
 30
 Mason, on the same side. It is said, there must be a pre-existing intention to go to a French port. If the sloop had arrived safe at the Havanna, and been there sold to an agent of the French government, it is clear she would have been liable to forfeiture. So, if the French agent, who signed the passport, had freighted the vessel.
 
 
 31
 These cases show, that a pre-existing intention is not necessary. The construction contended for would, indeed, open a wide door to fraud, as the gentleman has contended. It would only be necessary to start a plank in sight of the port, and then go in to stop the leak, and the whole law is evaded.
 
 March 6.
 
 32
 MARSHALL, Ch. J. delivered the opinion of the court, to the following effect:
 
 
 33
 The court is of opinion, according to the best consideration they have been able to give the subject, that this case is not within the act of congress of 1798, usually called the non-intercourse law.
 
 
 34
 It is contended by the counsel for the defendant, that the circumstances, stated in the special verdict, do not show an absolute necessity for the trading therein described. And it is said, the plaintiff might have abandoned the property, and sought redress of his government; and that it was his duty to do so, rather than violate the laws of his country. But the court is of opinion, that the act of congress did not impose such terms upon a person who was forced by stress of weather to enter a French port, and land his cargo, and was prevented by the public officers of that port to relade and carry it away.
 
 
 35
 Even if an actual and general war had existed between this country and France, and the plaintiff had been driven into a French port, a part of his cargo seized, and he had been permitted by the officers of the port to sell the residue, and purchase a new cargo, I am of opinion, that it would not have been deemed such a traffic with the enemy as would vitiate the policy upon such new cargo.
 
 
 36
 The terms of the act of congress seem to imply an intentional offence on the part of the owners.
 
 
 37
 The case put of a French agent going to the Havanna, and there purchasing the cargo for the use of the French government, under a pre-concert with the owners, would certainly be an offence against the law; but when there is no such intention; when the vessel has been absolutely forced, by stress of weather, to go into a French port, and land her cargo; when part has been seized for the use of the government of France, and the master has been forbidden by the public officers of the port to relade the residue, and to sell it for any thing valuable, except the produce of the country, the mere taking away such produce cannot be deemed such a traffic as is contemplated by the act of congress.
 
 
 38
 Judgment affirmed, with costs.*
 
 
 
 *
 Judge Washington.
 Judge Paterson, in September, 1799, in the case of Richardson and others, cited in 1 Caines' New-York Cases, p. 63. Vol. III.
 
 
 *
 See the opinion of the supreme court of New-York, in this case, in 1 Caines' New-York Cases, 64; and that of the High Court for the trial of Impeachments and correction of Errors, in the state of New-York, delivered by Lansing, Chancellor, in 1 Caines' New-York Cases in Error, p. 43.