THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LARRY WITTED, Defendant-Appellant.

First District (2nd Division)   No. 77-1560

Opinion filed November 20, 1979.

G. Michael Cooper, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Wesley H. H. Ching, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

The defendant, Larry Witted, was charged by information with having committed the offenses of attempt murder and armed robbery on April 17, 1976. Following the trial, the jury returned verdicts finding the defendant guilty of attempt murder, armed robbery, and aggravated battery. Judgment was entered on the attempt murder and armed robbery charges and verdict findings. The defendant was sentenced to concurrent terms of 10 to 30 years for attempt murder and 5 to 15 years for armed robbery. He appeals contending (1) that the trial court erred in denying his motion to suppress the victim's identification testimony allegedly predicated on suggestive photographic and lineup identification procedures and not of an independent origin; (2) that the trial court erred in refusing to permit defense counsel to examine the prospective jurors regarding the defense of mistaken identity during *voir dire*; (3) that the prosecutor's conduct and the trial court's failure to control that conduct deprived him of a fair trial; (4) that the State failed to prove him guilty of the offenses charged beyond a reasonable doubt; and (5) that the sentences he received were excessive.

Harry Wojtanowicz testified that at 9:30 a.m. on Saturday, April 17, 1976, he and two other employees of the Morrison Furniture Company delivered a sofa to an apartment at 206 West 147th Street in Harvey, Illinois. The other two returned to the truck while Wojtanowicz collected the C.O.D. and had the customer sign some papers. As Wojtanowicz left the customer's basement apartment, he noticed a man standing in the center hallway about 5 to 10 feet away from him. He looked at the man, whom he had not seen before, and said "Hi" as he walked toward the exit. Just as Wojtanowicz reached the doorway, the man grabbed him from behind, turned him around, and placed a gun against his head. The man ordered him to place his hands on the wall and then demanded his money. Wojtanowicz testified that although he was facing the wall with the man standing behind him, with his head turned to the side he could see the man's face. After taking Wojtanowicz's wallet containing $140 in cash, his sunglasses, and the C.O.D. check from his pockets, the man demanded more money. To Wojtanowicz's reply that he didn't have any more, the man stated, "I ought to blow your brains out," and fired the gun as Wojtanowicz turned away. The shot creased Wojtanowicz on the forehead. The man then ran out of the building to 147th Street as Wojtanowicz turned around and looked at him. After being treated for his

wound, Wojtanowicz looked at between 70 and 75 "mug shot" photographs at the Harvey police station but did not recognize the offender.

Wojtanowicz further testified that on May 7, 1976, while at work, he was shown 25 additional photographs by Investigator Lawrence Painter; that he identified the defendant's picture as the offender toward the end of the pile and pulled it out; and that the defendant's picture was the only one without two views and writing on it. Wojtanowicz further testified that a few days later he identified the defendant from a lineup of four to five men at the Harvey police station, and that he knew it was the person whose picture he had seen earlier. On June 3, 1976, he identified the defendant at a preliminary hearing, and later, during the trial, again identified the defendant as the offender.

Wojtanowicz also testified that he observed the defendant for one minute in the hallway before he was grabbed and for another minute while the defendant searched him. He indicated that the lighting conditions were good in the hall, illumination being provided by artificial lights and sunlight streaming through stained glass windows on a sunny day. He said the defendant had on a green shirt and dark pants at the time and had short hair. He further stated that he was absolutely certain that the defendant was the man who robbed and shot him on April 17.

Prior to trial the defendant filed a motion to suppress Wojtanowicz's photographic and lineup identification testimony. At the hearing on this motion, the defendant called Investigator Lawrence Painter. Painter testified that he first arrested the defendant in connection with an unrelated armed robbery of a food store, and that the defendant was photographed while in custody. At 3 to 3:30 p.m. on May 7, 1976, Painter showed Harry Wojtanowicz the defendant's photograph along with 24 other police "mug shot" photographs, all of which were Polaroid photographs. The defendant's picture had no marks on it, three had numbers handwritten on them, and the rest had police signs on them. The defendant's photograph displayed only one view and the 24 others displayed two views. Painter testified that he selected the 24 other pictures on the basis of descriptions similar to that of the defendant's. Painter handed a stack of 24 pictures to Wojtanowicz who looked at them one at a time. He further stated that after looking at 17 photographs, Wojtanowicz picked out the defendant's photograph saying, "This is the person that robbed me." Although the photographic identification took place at the furniture company where Wojtanowicz worked, no one else was present. Painter further indicated that Wojtanowicz had previously looked at a book containing 50 photographs at the police station but did not identify the offender from them.

Painter further testified that on May 12, 1976, he conducted a lineup composed of four black males including the defendant. The defendant was the only one whose picture was in the group of 25 photographs previously shown to Wojtanowicz. After being notified of the lineup, the defendant signed a waiver form acknowledging that he had read the statement of procedures, was aware of his rights, and did not desire the presence of an attorney. Painter testified that the defendant looked at the form and examined it before signing it. Investigator Graves was also present at the lineup in which Wojtanowicz identified the defendant.

Investigator Painter's testimony at trial, including his testimony as to Wojtanowicz's photographic and lineup identifications of the defendant, was substantially the same as his testimony at the pretrial hearing on the defendant's motion to suppress. He further testified at trial that no physical evidence incriminating the defendant was recovered, and that he had talked to a Mr. Malone during his investigation, who said he could not identify the offender other than as a black male.

The defendant testified on his own behalf at the hearing on the motion to suppress the identification testimony. Defendant recalled being arrested on May 6, 1976, for an unrelated offense and being released after his father posted bond at a hearing in Markham court a day or two later. Investigator Painter testified at the hearing that at 9:30 a.m. on May 7, 1976, he was present at the defendant's bond hearing where the defendant's father indicated he had sufficient money to post bond for his son. The defendant further testified at the pretrial hearing that he remembered reading and signing the waiver form entitled "Required Warning and Procedure for Lineup" which Painter showed him on May 12, 1976, at the Harvey police station. He admitted that his signature was on the document. The defendant stated that he was told he had to sign it to appear in the lineup, so he signed it knowing that he would be released if he was not identified. He further stated that, although he did not understand it, he signed the waiver anyway. He was not aware of the fact that he had a right to have an attorney present at the lineup; if he had known, he probably would have wanted one present. No one was present on his behalf. The defendant graduated from Thornton High School in 1975 with a B to C average. The defendant's motion to suppress was denied.

At trial, Horace Witted testified that he and his wife and children, including the defendant, lived at 14554 Roby in Dixmoor, Illinois, about four blocks from 206 West 147th Street where the robbery occurred. According to Mr. Witted, the defendant worked with him at one of his two rib houses from 4 p.m. to 3 a.m. on April 16, 1976; they then went home to sleep. At 10:30 to 11 a.m. on April 17, Mr. Witted got up and saw

the defendant in bed. Mr. Witted did not know where his son was at 9:30 a.m. that morning.

Norma Jean Malone testified that she lived at 14716 Hoyne, Harvey, Illinois, and that she knew the Witted family casually. While sitting on her front porch with her husband and two others on the morning of April 17, 1976, she saw a furniture truck parked behind the apartment building located at 206 West 147th Street. At about 9:30 to 9:40 a.m. she heard a loud noise, and two to three minutes later saw a man hurrying down 147th Street with his hand in his pocket. She did not see the man leave the apartment building as her view was blocked. Mrs. Malone described the man that she saw as taller, heavier, and darker than the defendant. She testified that the defendant was not the man she saw that day running down 147th Street, and that she did not know who shot the victim or whether it was the defendant.

Bishop R. L. Davis and Selita Jackson testified that the defendant had a good reputation for being a peaceful and law-abiding citizen.

The defendant testified at trial that he had been employed as a manager trainee of his father's rib house since his graduation from high school. On April 16, 1976, he worked there from 4 p.m. to 3 a.m., and then went directly home to bed. The defendant stated that he slept until 12 noon on April 17, 1976, and did not leave the house during that time. At 1 p.m. he left his house to visit his girl friend at her home at 14715 Hoyne across from the Malones. According to the defendant, the building at 206 West 147th Street is only one house from that of the Malones. Although the defendant knew two families living at 206 West 147th Street, he testified that he did not enter that building on the day of the incident or on any other day. The defendant further stated that he stayed at his girl friend's home until 3:30 p.m. and then went back to work at the rib house. He had no records showing that he worked at the rib house because he was paid in cash and did not file any income tax returns. The defendant denied robbing or shooting Wojtanowicz.

Following closing arguments, the jury returned verdicts finding the defendant guilty of attempt murder, armed robbery, and aggravated battery. Holding that the aggravated battery charge merged, the trial court entered judgment on the attempt murder and armed robbery verdicts. After arguments in aggravation and mitigation, the court sentenced the defendant to concurrent terms of 10 to 30 years for attempt murder and 5 to 15 years for armed robbery. The defendant appeals.

# I.

The defendant first contends that the trial court erred in denying his pretrial motion to suppress the identification testimony of Wojtanowicz.

He argues that both the photographic and lineup procedures used were so unnecessarily suggestive as to undermine the reliability of the identification testimony, thereby warranting its exclusion.

## A.

■■ At the outset, it should be noted that the defendant failed to claim his error in either a written or oral motion for a new trial in accordance with section 116—1 of the Code of Criminal Procedure. (Ill. Rev. Stat. 1977, ch. 38, par. 116—1.) The failure to present a reviewable issue in a motion for a new trial even though that issue involves a constitutional right constitutes a waiver of that issue. (*People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 567, 374 N.E.2d 904, citing *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, and *People v. Daily* (1975), 30 Ill. App. 3d 413, 418, 332 N.E.2d 146.) However, issues not properly preserved for review which deprive a criminal defendant of a fair and impartial trial may be considered where the evidence is closely balanced (*Pickett*, 54 Ill. 2d 280, 283), or where the court recognizes plain error (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a)). A discussion of the merits of the defendant's contentions discloses that the identification testimony was properly received by the trial court.

## B.

Defendant contends that the use of photographic identification procedures while he was in custody was improper, and that the manner of their use was unnecessarily suggestive. The defendant's claim that he was in custody when Investigator Painter showed the 25 pictures to Wojtanowicz rests solely on his testimony. The State disputes this contending that Investigator Painter's testimony that the defendant's father posted bond for the defendant's release at the bond hearing at 9:30 a.m. on May 7, 1976, before the pictures were shown to Wojtanowicz at 3 to 3:30 p.m. the same day, establishes that the defendant was not in custody at the time of the photographic viewing. The defendant testified that he was arrested for the unrelated offense on May 6, 1976 and released a day or two later after a bond hearing. At trial Horace Witted testified that the defendant was arrested for the instant offenses on May 12, 1976. Although the inference arises that the defendant was not in custody at the time of the photographic identification, there is nothing conclusive in the record to rebut the defendant's testimony that he was in custody at that time.

■■ Nevertheless, although our supreme court has expressed its disapproval of the use of photographic identification procedures when a suspect is in custody and a lineup is otherwise feasible (*People v. Holiday*

(1970), 47 Ill. 2d 300, 307, 265 N.E.2d 634), the court did not establish a per se rule prohibiting the use of photographs under these circumstances. There is no legal necessity that an identification of a defendant be made in a lineup *(People v. Moore* (1974), 17 Ill. App. 3d 507, 510, 308 N.E.2d 210) for the practice of showing photographs of suspects to witnesses is essential to effective law enforcement *(People v. Brown* (1972), 52 Ill. 2d 94, 99, 285 N.E.2d 1). Therefore, we turn to the defendant's contention that the manner in which the photographs were displayed to Wojtanowicz was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. See *Simmons v. United States* (1968), 390 U.S. 377, 382, 19 L. Ed. 2d 1247, 88 S. Ct. 976.

■■ The defendant contends that the photographic procedure in the instant case was highly suggestive because the defendant's photograph was the only one in the group of 25 without any writing on it and with only a single view rather than two views. We disagree.

Although each case involving pretrial photographic identification must be considered on its own facts *(Simmons,* 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967), we note that in *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297, the court upheld, as not so suggestive standing alone as to require reversal, a photographic procedure in which the victim of an armed robbery selected a color photograph of the defendant from among 19 other photographs, all of which were in black and white *(Hudson,* 7 Ill. App. 3d 333, 335-36). Moreover, in *People v. Hart* (1973), 10 Ill. App. 3d 857, 295 N.E.2d 63, the court refused to find the photographic procedure unnecessarily suggestive even though the defendant's picture was larger than the four others, and his was the only one with a date written on it *(Hart,* 10 Ill. App. 3d 857, 859). We do not find that the procedure used in the instant case distinguished the defendant's picture any more than the procedures used in the foregoing cases distinguished those defendants' pictures.

Moreover, there is nothing in the record to suggest that Investigator Painter prompted or assisted Wojtanowicz in making the photographic identification. Since Wojtanowicz selected the defendant's picture as the 18th in the stack of 25 photographs which he viewed one at a time, we find it unlikely that he would remember any distinguishing features with regard to the defendant's picture. Investigator Painter testified that all of the photographs were Polaroid, and the subjects of the photographs were selected on the basis of descriptions similar to that of the defendant. Under these circumstances, we cannot say that the lack of writing on the defendant's picture or the single view rendered the photographic display so unnecessarily suggestive as to warrant the exclusion of the identification testimony based thereon.

## C.

Nor does the fact that the defendant was the only person in the lineup whose picture had been previously shown to Wojtanowicz render the identification testimony inadmissible. This precise argument was made in *People v. Jackson* (1973), 12 Ill. App. 3d 789, 299 N.E.2d 142, and *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644, and was rejected (*Jackson*, 12 Ill. App. 3d 789, 793; *Owens*, 46 Ill. App. 3d 978, 991). We are of the opinion that this argument must likewise be rejected in the instant case.

Even assuming that these pretrial identification procedures were suggestive, the identification testimony may nevertheless be admissible if from the totality of the circumstances it is shown by clear and convincing evidence that the identification was based on observations of the defendant other than during the arguably improper pretrial identification. (See *United States v. Wade* (1967), 388 U.S. 218, 239-40, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; *People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631.) The burden is on the State to prove that the in-court identification was not tainted by the alleged illegal procedures but rather was of an independent origin. *People v. Hatcher* (1977), 45 Ill. App. 3d 374, 387, 359 N.E.2d 1157.

Reliability is the linchpin in determining the admissibility of identification testimony. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 97 S. Ct. 2243.) The indicators of a witness's ability to make an accurate identification include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the length of time between the crime and the confrontation. *Manson*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 97 S. Ct. 2243.

In the instant case Wojtanowicz testified that he observed the defendant for one minute in the hallway before he was grabbed and for another minute while the defendant searched him. As the defendant ran out of the building, Wojtanowicz turned around and again looked at him. He indicated that the lighting conditions in the hall were good, and that the defendant had short hair and wore a green shirt and dark pants at the time. Wojtanowicz testified that he was absolutely certain that the defendant was the man who robbed and shot him. He first identified the defendant from the photographic display approximately three weeks after the crime and after looking at approximately 100 photographs. Since no physical evidence relating to the crime was recovered, there is nothing in the record disputing the accuracy of Wojtanowicz's prior description of the defendant. Under these circumstances, we believe that Wojtanowicz's

in-court identification was independently based upon his close observation of the defendant during the commission of the offense charged, and, therefore, was properly admitted.[1]

## II.

The defendant next contends that the trial court improperly refused to allow questions to the prospective jurors concerning the defense of mistaken identity, thereby denying him his right to a trial before a fair and impartial jury.

During defense counsel's *voir dire* examination of a prospective juror, he posed the question: "Do you believe that a person can be mistaken about the identification of another?" The prosecutor's objection was sustained by the trial court, finding the question to concern matters of law or instructions. In the instant case, the only issue presented to the jury at trial was that of identity, and, therefore, the credibility of the victim as to the identity of the defendant was of paramount interest to the jury. The trial court instructed the jury regarding the credibility of the witnesses.

The purpose of *voir dire* examination is to permit counsel to ascertain whether the minds of prospective jurors are free from bias and prejudice. (*People v. Carpenter* (1958), 13 Ill. 2d 470, 475, 150 N.E.2d 100, *cert. denied* (1958), 358 U.S. 887, 3 L. Ed. 2d 115, 79 S. Ct. 128.) *Voir dire* examination is to be initiated by the trial judge and may be supplemented by the parties at the court's discretion. (*People v. Stewart* (1973), 12 Ill. App. 3d 226, 230, 297 N.E.2d 391.) How much latitude the trial judge gives to the parties in their supplemental examination is also at his discretion. (*Stewart.*) We do not believe the trial court abused its discretion in the instant case.

*People v. Moore* (1972), 6 Ill. App. 3d 568, 286 N.E.2d 6, is in our opinion not comparable to the instant case. There, the court reversed and remanded the case for a new trial not only on the basis of the trial court's refusal to permit defense counsel to inquire of the prospective jurors' attitudes as to the defense of insanity, but also on the basis of newly discovered evidence which contradicted the State's expert witness. Moreover, the insanity defense is an extremely controversial subject receiving much publicity about which prospective jurors may have formed prejudicial or biased opinions. We find no basis for assuming that a person may harbor a bias or prejudice toward the essentially innocuous defense of mistaken identity. For all of the foregoing reasons, we are of

---

[1] Although the defendant's brief statement of the facts includes his testimony as to failure to understand the waiver form signed by him prior to the lineup, he does not argue that the absence of counsel at the lineup unconstitutionally deprived him of due process. Nor did he include this claim in a post-trial motion. Under these circumstances, the issue is waived and will not be discussed.

the opinion that the trial court properly and reasonably limited the *voir dire* examination. See Supreme Court Rule 234 (Ill. Rev. Stat. 1977, ch. 110A, par. 234).

## III.

Defendant next contends that he was denied a fair trial by prosecutorial misconduct during his closing argument and cross-examination of the defendant, and by the trial court's failure to take prompt corrective actions in the form of cautionary instructions or admonishments. Defendant's claim that he was denied a fair trial by the closing argument of the assistant state's attorney is buttressed by several references to the record. Without overlooking the importance of others, or minimizing the cumulative effect that they had on the defendant's right to a fair trial, we will discuss only two of the instances about which he complains.

At the outset we note that following closing arguments, the defendant orally moved for a new trial asserting the prosecutor's alleged prejudicial comments as grounds therefor. Thus, we find that the defendant properly preserved the issue for our review. See *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 107-08, 289 N.E.2d 256.

It is well settled in Illinois that even though every defendant is entitled to a trial that is free from improper comments or arguments that engender prejudice, his conviction will not be disturbed on review unless such remarks (1) constitute a material factor in his conviction, or (2) result in substantial prejudice to the accused. (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 415, 355 N.E.2d 634.) In determining whether the prosecutor's comments or arguments constituted prejudicial error, the test employed is whether the jury would have reached a contrary verdict had the improper remarks not been made. (*Franklin.*) In making this determination, reference must be made to the content of the language used, its relation to the evidence, and the effect of the argument on the rights of the accused to a fair and impartial trial. *People v. Mitchell* (1975), 35 Ill. App. 3d 151, 164, 341 N.E.2d 153.

■ Although it has been found impractical to lay specific guidelines for proper argument to the jury (see *People v. Gilmore* (1969), 118 Ill. App. 2d 100, 110, 254 N.E.2d 590, *cert. denied* (1970), 400 U.S. 845, 27 L. Ed. 2d 81, 91 S. Ct. 89, and, therefore, each case must be decided on its own facts (see *People v. Bigsby* (1977), 52 Ill. App. 3d 277, 281, 367 N.E.2d 358), a few general rules of pertinence to this appeal have developed. Thus, the prosecutor may not (1) make statements solely to inflame the passions or arouse the prejudices of the jury (see *People v. Heidman* (1957), 11 Ill. 2d 501, 511, 144 N.E.2d 580, *cert. denied* (1958), 355 U.S. 931, 2 L. Ed. 414, 78 S. Ct. 412); (2) accuse defense counsel of fabricating a defense, of

attempting to free his client by trickery, and of encouraging the defendant to testify accordingly, or suggest that the defendant was well coached (see *People v. Freedman* (1954), 4 Ill. 2d 414, 422, 123 N.E.2d 317; *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 18, 351 N.E.2d 402); (3) make comments not based on evidence and issues of trial (see *Bitakis*, 8 Ill. App. 3d 103, 106); (4) make comments which make it appear to the jury that the defendant was trying to keep unfavorable evidence from them (see *Hovanec*, 40 Ill. App. 3d 15, 17-18); or (5) persistently ask questions or make comments after an objection has been sustained (*Hovanec*, 40 Ill. App. 3d 15, 18; *Gregory v. Richey* (1923), 307 Ill. 219, 229, 231, 138 N.E. 669). Applying these tenets to the case at bar, we cannot say that the prosecutor's comments did not contribute to the defendant's convictions.

The following colloquy ensued during the prosecutor's rebuttal closing argument in response to defense counsel's argument that both the photographic identification and lineup identification were suggestive:

> "State's Attorney: No, they tell you that the twenty-five photographs have dual pictures like that and that you get the picture of Larry and it is a single shot. That's the so-called distinctive and suggestive thing about the photographic line-up. A man went through fifty or seventy-five pictures in the mug book and says the guy is not there. The man went through these pictures and picked out this picture and recognizes it, because he is the guy. It was a terrible experience. *You better believe the issue was raised and litigated before and Your Honor said it was not suggestive.*
>
> Defense Counsel: Your Honor, objection.
>
> The Court: Disregard any argument or reference to any prior hearing on matters of law and other hearing.
>
> State's Attorney: *Not because there was not such a hearing, but because I should not argue it here?"* (Emphasis added.)

In the instant case, the sole issue for the jury's resolution was whether the victim had correctly identified the defendant as the person who had robbed him. The victim's identification, while positive, was uncorroborated by any other evidence. Defense counsel properly argued to the jury the possibility of misidentification due to the alleged suggestiveness of the pretrial identification procedures. Although it is clear to us that the prosecutor's invited response was directed to the propriety of the identification procedures, we cannot say that the jurors did not interpret these comments as dispositive of the ultimate factual issue of identification. Nor do we believe the court's admonishment cured the prosecutor's objectionable comments. In our opinion, the court's instruction to disregard the reference to the prior hearing was insufficient to dispel the misconception possibly gleaned from the prosecutor's

comments that the defendant's identity as the offender had been determined by the trial court judge in the prior hearing. Finally, the prosecutor's persistent reference to the prior hearing after the objection to such reference had been sustained cannot be condoned.

Also in rebuttal, the prosecutor stated:

"Harry is telling you what happened, and Mr. Cooper with his experience, polish, his dash and with the witnesses in the wings; that when they call or pull the strings have them say whatever he wants, they are really against Harry. * * * He wants you to believe that if we had anything to say that Larry is not the little management trainee, law abiding trainee, excellent family man, excellent church going person, that we would present it to you. We would, but for the law. My job would be much easier if I would have told you more about Larry Witted, but you would have seen Mr. Cooper going off like a giant firecracker, but his client almost slipped. Remember when I asked him arrests? He almost slipped out.

Mr. Cooper: Judge, I object.

State's Attorney: Use your common sense. Don't let him sell you a bad bill of goods. * * * Don't let him hide behind technicalities in the law.

Mr. Cooper: I object to that. What technicalities am I hiding behind?

State's Attorney: Again, a puff of smoke. Ladies and gentlemen—

Mr. Cooper: Judge, would you admonish the prosecutor not to continue arguing along that line?

State's Attorney: I thought his lips were sealed, but obviously they are not.

The Court: Don't continue along that line, Mr. Arthur."

As the State contends, defense counsel had argued on closing that the defendant "had laid open his life history to every single possible attack"; that "if they [the prosecutors] had some kind of evidence that could have been used against Larry Witted, you know they would have used it"; and that "if it wasn't brought out, it does not exist." However, the prosecutor's comments went far beyond a fair reply to the defendant's argument that the State had produced all the legal evidence it had against the defendant to attempt to demonstrate the weakness of the State's case. The prosecutor not only implied that the defense witnesses perjured themselves at defense counsel's request, but also raised the inference that the defendant had a criminal background which defense counsel was hiding from the jury. There is no evidence in the record to support the prosecutor's comments. The prosecutor's argument, not based on

evidence, which made it appear to the jury that defense counsel was trying to keep unfavorable evidence from them, and which suggested that defense counsel had fabricated a defense and encouraged the witnesses to testify accordingly, was highly objectionable. Despite defense counsel's objections, the prosecutor was permitted to continue along this improper line of argument. At no time did the trial court sufficiently rule on the defendant's objection or admonish the jury to disregard the prosecutor's comments. Since the prosecutor's comments were made in rebuttal closing argument, defense counsel had no opportunity to dispel the inferences raised by the prosecutor's improper remarks.

■■ Considering the foregoing in light of the evidence presented and the other instances of prosecutorial misconduct not discussed, we cannot say that the jury could not have reached a contrary verdict had the improper remarks not been made. Therefore, the defendant must be given a new trial.

## IV.

Defendant next contends that the State failed to sustain its burden of proving him guilty of the offenses charged beyond a reasonable doubt. The defendant's failure to file a post-trial motion preserving this claimed error for our review precludes us from reviewing the evidence of the defendant's guilt other than under the plain error doctrine of Supreme Court Rule 615(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a)). By this doctrine a court on review may consider errors not properly presented in cases in which the evidence is closely balanced. (*People v. Richardson* (1977), 49 Ill. App. 3d 170, 172, 363 N.E.2d 924; *People v. Howell* (1975), 60 Ill. 2d 117, 121, 324 N.E.2d 403.) In view of the fact that, for other reasons, we are reversing and remanding this matter for a new trial, we do not deem it necessary, under all the circumstances, to comment on this issue.

## V.

At the time applicable to this conviction, armed robbery and attempt murder were Class 1 felonies (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4 and 18—2) punishable by a maximum term of imprisonment for "any term in excess of 4 years" (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—1(b)(2)) and by a minimum term of "4 years unless the court, having regard to the nature and circumstances of the offense and history and character of the defendant, sets a higher minimum term" (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—1(c)(2)). The defendant contends that the imposition of the higher minimum terms of 10 years for attempt murder and 5 years for armed robbery constitutes an abuse of the trial court's discretion.

Although we have determined that the defendant is entitled to a new trial, we believe it appropriate to discuss this point.

As we stated in *People v. Kosanovich* (1979), 69 Ill. App. 3d 748, 387 N.E.2d 1061:

"A reasoned judgment as to the proper sentence must be based on the particular circumstances of each individual case. [Citation.] Such a judgment depends on many factors including the defendant's demeanor, general moral character, mentality, social environment, habits, age, inclination to commit crimes, and the stimula which motivated his conduct [citations], in addition to the defendant's past criminal record [citation] and his degree of activity and participation in the crime [citation]. Moreover, both the Illinois Constitution and the design of the Unified Code of Corrections require that penalties be determined not only according to the seriousness of the crime but also according to the rehabilitative potential of the offender with the intent to restore him to useful citizenship [Citations.]" *Kosanovich*, 69 Ill. App. 3d 748, 751.

The record in the instant case shows that the defendant was the sixth of eight children living with his parents in a moderate income residential area at the time of these offenses. The defendant had been employed by his father since he was 14 years of age and had graduated from Thornton High School with a B or C average. The presentence report indicates that he was active in the Apostolic Faith congregation, had no debts or financial obligations, and didn't drink hard liquor or use narcotics. The defendant was 18 years of age at the time of these offenses and had no prior criminal or adult probation record. Two witnesses testified to the defendant's reputation as a peaceful, law-abiding citizen of the community in which he lived.

Although we do not discount lightly, nor condone, the use of excessive physical force and violence during the commission of any crime, we note that this is the only evidence supporting the imposition of the higher minimum terms. We are of the opinion that the defendant's young age, the absence of any previous criminal record, and his general reputation as an intelligent, hard-working youth are factors which should receive serious consideration should the trial court be again faced with the necessity of imposing a sentence.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded.

Reversed and remanded.

STAMOS, P. J., and PERLIN, J., concur.