THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EDDIE PITTS, Defendant-Appellant.

First District (4th Division)    No. 80-1489

Opinion filed February 11, 1982.

Steven R. Decker, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Dean Morask, and Sheila M. King, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Following a jury trial, defendant, Eddie Pitts, was found guilty of murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1). On September 3, 1979, defendant received a sentence of not less than 150 years and not more than 300 years imprisonment.

On appeal, defendant raises the following issues for review: (1) whether the trial court erred in failing to give an instruction outlining the procedure to be followed upon a verdict of not guilty by reason of insanity; (2) whether the trial court erred in denying defendant the right to question prospective jurors on the *voir dire* examination with respect to

any bias or prejudice they might have against the defense of insanity; (3) whether the trial court erred in allowing the State to call rebuttal witnesses to testify where these witnesses were not listed on the State's list of witnesses; (4) whether the trial court erred in admitting hearsay testimony when it allowed the State to question Dr. Bogan about reports which he had never seen and which were never tendered to defense counsel prior to trial; (5) whether the State failed to meet the burden of proving the defendant sane beyond a reasonable doubt; and (6) whether defendant was deprived of a fair trial by prosecutorial misconduct during the closing argument by deliberately misstating evidence and by making prejudicial remarks.

We affirm.

The testimony at trial was as follows. Winston McCain testified that on November 30, 1976, he and Jerry Keane were employed by People's Gas Company. They answered complaint calls principally concerning gas leaks. On that date, November 30, they were called to repair a gas leak at 6620 South Harvard Avenue, in Chicago. Edward Stewart answered the door and informed them that the gas odor was emanating from the bedroom. Eddie Pitts, whom the witness later identified as defendant, walked toward them. Stewart, Keane, the witness and defendant all proceeded up the stairs to the bedroom. Defendant neither said nor did anything unusual at this time. Defendant was dressed in dark clothing and wore a purple fez.

The four men left the bedroom and proceeded to the basement where Keane examined the furnace. Keane went over to inspect the flue of the furnace and to remove the furnace door. Stewart was standing in the doorway of the basement. When McCain saw that Keane was having some difficulty in removing the furnace door, he started upstairs to get a screwdriver. As McCain was going up the stairs, Keane screamed, "Winston, run, get help." He ran back downstairs and saw defendant with his left arm around Keane's neck, hitting or "stabbing" him in his chest with his right hand. McCain then ran outside to radio for help.

Edward Beale testified that he is a Chicago police officer and that he was called to the scene. He was admitted into the house by Donna Petty and Edward Stewart. He entered the basement where he found Keane lying on the floor with bloodstains all over his body. When he went over to Keane, he could not find any vital signs. Approximately 3 feet from the body, he found a small pocketknife, a book of matches, and a flashlight.

John Smith testified that he is a Chicago police investigator and that on November 30, 1976, he conducted a homicide investigation at 6620 South Harvard. On December 1, 1976, he interviewed defendant and informed him of his constitutional rights. In response to questions asked by Smith, defendant stated that he had thrown away the knife used in the

killing. Defendant said he had spent the night in a vacant building. Smith stated that defendant acted normally and spoke in normal tones.

Dr. Gilbert Bogan was called on behalf of the defendant. Bogan, a psychiatrist, testified as to the mental state of defendant. In February 1979, Bogan examined defendant for fitness and sanity. At that time, he found defendant was not fit. On April 5, 1979, he again examined defendant and again found defendant unfit for trial. Subsequently, on September 12, 1979, he examined defendant and diagnosed him as schizophrenic, paranoid type in remission with medication. He stated that at the time of the alleged murder, defendant could appreciate the criminality of his conduct but was unable to conform his conduct to the requirements of the law.

During Bogan's examination of defendant in February 1979, defendant told him that he was going to plead not guilty, and that he was psychotic at the time of the incident, and that he heard voices. Defendant told Bogan that he first began hearing voices at the age of 12 or 13 and that the affliction became much worse after taking drugs. Defendant also said that he began taking drugs 3 days prior to the alleged offense.

In the psychological reports, defendant told the psychologist that he stabbed a gas man whom he did not know because a voice told him to do so. The trial court sustained the State's objection to Bogan's testimony of what someone else wrote down in the psychological reports as to what defendant said. The trial judge instructed the jury that the conversations between defendant and Bogan were to be received for the limited purpose of the fact that Dr. Bogan had those conversations with defendant and not to prove the truth of the matter asserted.

On cross-examination, Dr. Bogan reiterated his opinion that defendant was insane at the time of the alleged offense. He changed his opinion when the State introduced certain reports not previously read or relied upon by Dr. Bogan. The trial judge overruled defendant's objection to the reports as hearsay and allowed the reports to be admitted. The reports of April 1, 1977, stating that defendant had no recollection of the alleged murder were written by social worker Dillingham, and those of April 13, 1977, were written by Dr. Armil. On April 18, 1977, Dr. Jewitt Goldsmith's report stated that defendant remembered only that he returned to the scene of the incident to find a body on the floor and a knife in his hand.

Three reports were admitted regarding whether defendant was under the influence of drugs: the first report, written by Dr. Tuteur, stated that defendant began taking drugs 3 days prior to the incident; the second report, by Dr. Goldsmith, stated that defendant had not taken drugs at least 1 day prior to the killing; and the final report, by Dr. Kaplan, stated that defendant had stopped using drugs 6 to 9 months prior to the killing.

On redirect, Dr. Bogan testified that a schizophrenic, paranoid type

in partial remission could undertake certain actions which would seem commonplace and would be normal under certain circumstances. Defendant could suffer from a mental disease or defect by which he would be unable to conform his conduct to the requirements of the law on one day, and the next day the same person could conform his conduct to the requirements of the law even though he still had the mental disease.

The State then called rebuttal witnesses. Defense counsel objected to two of the State's rebuttal witnesses, Investigator Elbert Fitzpatrick and Dr. Gerson Kaplan, because they were not included in the State's answer to discovery. Defendant's objections were overruled and both were allowed to testify.

Investigator Fitzpatrick testified that on April 22, 1976, defendant answered questions regarding his name, age, date of birth, and physical description. He stated that, in his opinion, defendant was in contact with reality and sane on that date.

Investigator Smith was recalled and stated that defendant gave responsive answers to questions regarding his name, date of birth, place of birth, and social security number. He also stated that defendant was calm and composed and spoke coherently during the interview.

The defense was allowed to reopen its case in chief and called Dr. Verna Tuteur who testified that he examined defendant on July 14, 1979. He discussed with defendant the incident that occurred on November 30, 1976. Defendant stated that the victim was unknown to him, that he was under the influence of "pot," "red devils," and "PCP." Defendant told Tuteur that the voices told him to "kill the man." Defendant also felt that the whole world was going to kill him.

Dr. Tuteur's diagnosis indicated that defendant was suffering from a psychosis or drug intoxication. In Tuteur's opinion, defendant, on November 30, 1976, due to the mental disease, did not appreciate the criminality of his acts and could not conform with the requirements of the law. Dr. Tuteur stated that defendant was not faking the symptoms of a mental disease. On cross-examination, Dr. Tuteur did not change his opinion, even considering reports in which defendant contradicted himself.

The State's rebuttal witness, Dr. Gerson Kaplan, testified that on June 22, 1978, he examined defendant to determine competency for trial. Defendant told him that he was not on drugs at the time of the incident and had not used any drugs for 6 to 9 months prior to the incident. Defendant told Dr. Kaplan that when one of the gas men took out a knife he (defendant) felt this was an attack on him and he had to defend himself. Dr. Kaplan stated that defendant's actions prior to the stabbing were inconsistent with drug psychosis. In his opinion, defendant's act of throwing the knife away showed that he was aware of wrongdoing and

could appreciate the criminality of his conduct. Dr. Kaplan had no opinion as to whether defendant was able to conform his conduct to the requirements of the law. He could not say whether defendant was sane on November 30, 1976.

During the instruction conference, defendant tendered the instruction that "if you find the defendant not guilty by reason of insanity, the Court will then determine if the defendant is still in need of mental treatment." The court refused to give this instruction to the jury. Defendant also tendered an instruction regarding voluntary intoxication. That instruction was refused by the trial court.

Following closing arguments, the jury returned a verdict finding defendant guilty of murder.

Defendant contends the court erred in refusing his tendered instruction informing the jury that following a verdict of not guilty by reason of insanity he could be remanded to the Department of Mental Health for further examination and treatment. Defendant further claims that the jury has a right to know the consequences of a verdict of not guilty by reason of insanity and what legal action could thereafter be taken against him.

■■ We disagree with defendant's contentions. In *People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058, we declined to adopt a general rule of law requiring that the jury be given an instruction which related the consequences of a verdict of not guilty by reason of insanity. This instruction would inject into the trial and the deliberations of the jury extraneous and irrelevant matters that would have no bearing on defendant's guilt or innocence. (86 Ill. App. 2d 162, 170.) Moreover, such an instruction invites the jury to reach a compromise verdict, finding defendant not guilty by reason of insanity despite clear evidence of legal sanity because defendant may be incarcerated for treatment anyway. (86 Ill. App. 3d 162, 170.) Therefore, it was not error for the trial court to refuse such an instruction.

Defendant also contends the court erred in denying him the right to question prospective jurors on the *voir dire* examination with regard to any bias or prejudice they might have against the defense of insanity. The following questions were submitted by defense counsel for the trial judge to ask: "(1) do you have any feeling or viewpoint concerning the defense of insanity in a criminal case and if so what is it? and (2) do you agree with the concept that a person should not be held responsible for his acts if he is not capable to conform his conduct to the requirements of the law?" However, the trial judge refused to ask these questions.

It is well established that limitation of *voir dire* questioning may constitute reversible error where its effect is to deny a party a fair opportunity to probe an important area of potential bias or prejudice among prospective jurors. (*Gasiorowski v. Homer* (1977), 47 Ill. App. 3d

989, 991, 365 N.E.2d 43, 45.) The purpose of *voir dire* examination is to permit counsel to ascertain whether the minds of prospective jurors are free from bias and prejudice. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 164, 398 N.E.2d 68, 76.) *Voir dire* examination is to be initiated by the trial judge and may be supplemented by the parties at the court's discretion. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 164.) How much latitude the trial judge gives to the parties in their supplemental examination is also at his discretion. *People v. Witted* (1979), 79 Ill. App. 3d 156, 164.

■■ In view of the above statement of the law, we find the better procedure would have been for the trial judge to allow the questions. Further, we are aware that when insanity is an issue the parties have a right to examine jurors concerning their attitudes on an insanity defense. (*People v. Moore* (1972), 6 Ill. App. 3d 568, 571, 286 N.E.2d 6, 8.) However, we find that the trial judge's refusal to ask the questions in this case does not constitute reversible error due to the overwhelming evidence of defendant's guilt. The finding of defendant's guilt would not have changed even if the suggested questions had been put to the prospective jurors.

Defendant further contends that the trial judge erred in allowing the State to call rebuttal witnesses, and that such action was a violation of the discovery rules. (Ill. Rev. Stat. 1975, ch. 110A, par. 412(a).) Moreover, the State knew or should have known that defendant would probably present the defense of insanity and, despite this, the State failed to list Investigator Fitzpatrick or Dr. Kaplan on the list of witnesses it would call.

The discovery rules provide that the State must give defendant the names and addresses of all witnesses it intends to call, including a statement as to the substance of the testimony the witnesses will give at trial. (*People v. Galindo* (1981), 95 Ill. App. 3d 927, 932, 420 N.E.2d 773, 777.) Where rebuttal witnesses are concerned, the State need not inform defendant of the foregoing until the intent to call the rebuttal witness is formed. (*People v. Galindo* (1981), 95 Ill. App. 3d 927, 932.) The reason for this rule is that a prosecutor cannot know whether a witness will be called in rebuttal until the defense testimony is heard. *People v. Galindo* (1981), 95 Ill. App. 3d 927, 932.

Although we agree that the proper procedure is to have the State inform defense counsel of witnesses who will be called to testify in rebuttal when the State forms its intention, the trial court is not required to exclude the rebuttal witnesses' testimony, even though there has not been strict compliance with the discovery rule. (*People v. Galindo* (1981), 95 Ill. App. 3d 927, 932-33.) The exclusion of such testimony is within the sound discretion of the trial court and will only be reviewed upon a showing of prejudice to defendant. *People v. Galindo* (1981), 95 Ill. App. 3d 927, 933.

■■ Here, defendant has failed to show the chance of prejudice resulting from the failure of the State to give notice of the rebuttal witnesses it called. After carefully reviewing the record, we find that the trial court's ruling was not an abuse of discretion.

Defendant next contends the trial court erred in admitting hearsay testimony when it allowed the State to question Dr. Bogan concerning statements defendant may have given to other individuals which were contained in reports which Dr. Bogan had not seen previously. Further, these reports were not tendered to defense counsel prior to trial. Defendant asserts that testimony of an expert witness which is based in part upon reports and statements of others not available for cross-examination constitutes hearsay and is, therefore, inadmissible as evidence.

We disagree with defendant's contention. Our supreme court recently stated that it is unnecessary for hospital records to be admissible in evidence in order to elicit an expert medical opinion based upon such reports. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 192, 417 N.E.2d 1322, 1326.) Further, the supreme court stated that the holding in *People v. Ward* (1975), 61 Ill. 2d 559, 566-67, 338 N.E.2d 171, 176, indicating that medical records may be used by an expert witness in forming an opinion as to an accused's sanity even though the reports are not admitted into evidence, was based upon Federal Rule of Evidence 703. This rule "makes no distinction between the opinions of treating and nontreating doctors. The rule states: 'The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.' " (Fed. R. Evid. 703; *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193.) The key element in applying Federal Rule 703 is whether the information upon which the expert bases his opinion is of a type that is considered reliable. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193.

The supreme court concluded by holding that the trial procedures embodied in Federal Rules 703 and 705 should be followed. Under Federal Rule 705, an expert may give an opinion without disclosing the facts underlying the opinion. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 194.) The expert may give his opinion without disclosure of underlying facts as to whether the opinion is based on firsthand or secondhand information. (84 Ill. 2d 186, 194.) Moreover, due to the high degree of reliability of hospital records, an expert may give his response to a hypothetical question based on facts contained in those records, even if the hospital records themselves are not in evidence. 84 Ill. 2d 186, 194.

■■ Applying the above statement of the law to the instant case, we find

that the trial court did not err in allowing Dr. Bogan to consider statements contained in medical reports in arriving at an opinion.

Defendant next contends that the State failed to meet the burden of proving him sane beyond a reasonable doubt at the time of the commission of the offense.

The affirmative defense of insanity is defined in section 6—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 6—2(a)) as follows:

"A person is not criminally responsible for his conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

Every person is initially presumed to be sane. The defendant may overcome this presumption by presenting some evidence which raises some doubt of his sanity. (*People v. Moore* (1980), 89 Ill. App. 3d 202, 207, 411 N.E.2d 579, 583.) Once defendant has rebutted the presumption of sanity, the burden devolves upon the State to prove defendant's sanity beyond a reasonable doubt at the time of the offense. *People v. Dunigan* (1981), 96 Ill. App. 3d 799, 821, 421 N.E.2d 1319, 1335-36.

The question of the defendant's sanity at the time of the offense is to be determined by the jury as trier of fact. Once determined, a court of review will not overturn that finding unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice. *People v. Romaine* (1979), 79 Ill. App. 3d 1089, 1096, 399 N.E.2d 319, 325.

In the case at bar, defendant presented testimony from Dr. Bogan indicating that defendant was insane at the time of the offense. However, Dr. Bogan changed that opinion when the State introduced other reports that Bogan had not read previously. Dr. Tuteur, testifying for defendant, stated that, in his opinion, defendant was insane at the time of the offense. The State's rebuttal witness, Dr. Kaplan, testified that, in his opinion, defendant's act of throwing the knife away showed that defendant was aware of wrongdoing and could appreciate the criminality of his conduct. From this and other testimony, the jury determined that defendant was sane. This determination cannot be said to be palpably erroneous or against the manifest weight of the evidence.

Finally, defendant contends he was denied a fair trial when the prosecutor during the closing argument deliberately misstated the evidence and made prejudicial remarks. Defendant complains of the following remarks:

"Now, ladies and gentlemen, you decide who the professional is. Dr. Bogan, the man who when he found out things he didn't know

was honest and professional enough to say I could have been wrong. * * *

Or Dr. Teutor [sic], who wouldn't change his opinion if the roof fell down on him. He's here to collect his money and get his pay and hold his opinion."

Defense's objection to the above statements was sustained by the trial court. Defendant further complains of the following remarks made by the prosecutor:

"Even if what the defendant—the psychiatrists are saying is true, even if what Dr. Teutor [sic] is saying is true, that the Defendant took drugs on that day that made him psychotic, consider this. Who made him take those drugs? Jerry Keane, you, me, Mrs. Keane? Eddie Pitts took those drugs he says he took voluntarily. * * *—

* * *

When he made that choice to take them, he knew they made him hear voices, according to what Dr. Teutor [sic] said. And it was those voices, according to Dr. Teutor [sic] that made him kill Jerry Keane.

And so, ladies and gentlemen, when you decide if Eddie Pitts is responsible * * *—

* * *

When you make the decision, * * * ask yourselves who made Eddie Pitts take those drugs. Should he be held accountable for the actions that caused the death of Jerry Keane or not, because, of course, he should be and to say otherwise is to say to every drug user out there, * * * take as many drugs as you want, do anything you choose, but be sure to tell Dr. Teutor [sic] you were hearing voices."

Objections to these remarks were overruled by the trial court. Defendant asserts that these remarks were particularly improper in light of the trial court's failure to allow defendant's jury instructions IPI Criminal No. 24.02 (voluntary intoxication) and IPI Criminal No. 25.02 (drugged condition).

The Illinois Supreme Court has stated the following principles in *People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 327:

"The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him. (*North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486.) The general atmosphere of the trial is observed by the trial court, and cannot be reproduced in the record on appeal. The trial court is, therefore, in a better position

than a reviewing court to determine the prejudicial effect, if any, of a remark made during argument, and unless clearly an abuse of discretion, its ruling should be upheld. (*City of Chicago v. Chicago Title & Trust Co.*, 331 Ill. 322.)"

Further, no reversible error results from final argument unless the argument constitutes a material factor in the conviction, or resulted in substantial prejudice to the accused, or the verdict would have been different had the improper closing argument not been made. *People v. Burnette* (1981), 97 Ill. App. 3d 1015, 1021, 423 N.E.2d 1193, 1199.

■■ We do not find the remarks of the prosecutor were of such a nature as to have been prejudicial to the extent of denying defendant a fair trial. We cannot say the arguments made by the prosecutor were a material factor in defendant's conviction. The verdict would not have been different even absent the allegedly improper comments.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI and LINN, JJ., concur.