No. 2--03--0689

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court 

OF ILLINOIS,       )   of Du Page County.

     )

Plaintiff-Appellee,     ) 

 )

v. ) No. 01--CM--2039

 ) 

ANGELO M. MILLS, ) Honorable 

       ) William I. Ferguson,

Defendant-Appellant. ) Judge, Presiding.

______________________________________________________________________________

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

After a jury trial, defendant, Angelo Mills, was convicted on February 13, 2003, of Class A misdemeanor theft of labor or services (720 ILCS 5/16--3(a) (2000)), pursuant to an incident on February 16, 2001, in which he took his pickup truck from a Maaco repair shop without paying for the repairs performed on it.  He timely appeals, arguing that the evidence at trial did not establish beyond a reasonable doubt that he had the knowledge 
required for conviction of theft of labor or services.  For the reasons that follow, we reverse.

I.  FACTS

On April 10, 2001, defendant was charged by complaint with theft of labor or services, pursuant to the February 16, 2001, incident.  The cause proceeded to a jury trial, which was held on February 11, 2003, and February 13, 2003.  The State offered the testimony of Robert Tower, the general manager of the Maaco shop; and Michael Crimmins, the owner of the shop.  Defendant offered his own testimony along with that of Paula Yeager, his girlfriend; and Bruce Sparacio, his friend.  

Tower was the first to give his recollection of events relating to this case.  
He testified that, on July 19, 2000, defendant, who was a returning customer, brought his truck to Maaco for paint work and also to replace the locks on the driver's-side and passenger's-side doors.  On July 19, Tower prepared a written estimate of the costs for the repair work on the truck.  The estimate totaled $521.40, and it was signed by defendant.  Tower testified that he did not recall defendant's returning the truck to have the lock repairs redone in October 2000, but he stated that defendant did pick up the truck in late October 2000, after the initial repairs on the vehicle were finished.  Tower agreed on cross-examination that defendant paid for the repairs in full when he picked up the truck in October 2000.  

Tower testified that, on January 29, 2001, defendant told him via telephone that "[h]e was having issues with the locks.  He had to try to get into the vehicle."  Tower further testified: " I'm not sure if somebody had broken into it or tried to.  I know he attempted to break into it.  He had damaged the locks, and he wanted me to take a look at it."  According to Tower, defendant brought the truck in shortly thereafter, and Tower observed  that "[t]he back of the lock cylinders were broken.  The tumblers weren't functioning correctly.  The rods were bent.  It had obviously been tinkered with."  He stated that the truck locks were not in the same condition as they had been immediately following the initial repair work.  When asked what conversation he and defendant had regarding the repairs to be done after the truck was dropped off in January 2001, Tower stated that he "explained that [
sic
] the repairs that needed to be done.  [Defendant] said do whatever it takes to fix it."  Maaco prepared a repair order for the work done in January 2001, which included lock replacement and also some paint work.  Tower admitted that defendant never signed the repair order.  Tower testified that he "contacted [defendant] by phone, discussed this.  He gave me authorization to do whatever it took to repair the vehicle."  The repair order bears a notation, where a signature would normally appear, that the repairs were approved by phone.  Tower admitted on cross-examination that, under "normal circumstances," Maaco typically procures the customer's signature on an estimate form before proceeding with repairs.  He stated that he accepted defendant's authorization by phone because defendant lived some distance from the repair shop.  The total cost of the repair was $227.48.

Regarding whether Tower informed defendant that he was going to be charged for the repairs, the following colloquy took place between defense counsel and Tower:

"Q.  Okay.  Well, Mr. Tower, you never--you never told [defendant] that you were going to be charging him for that work; is that true?

A.  Yes, he knew.

Q.  Well, you didn't--

A.  He knew--

Q.  --have anything--

A.  --he knew that the fuel door was going to be no charge."

Tower further stated that, though Maaco normally warrants all its service and parts, the locks here were not covered by any warranty because they were damaged.

On February 16, 2001, defendant arrived at Maaco to pick up his truck.  Tower described the encounter as follows:

"We walked out to the vehicle.  I demonstrated that the locks were *** functioning correctly.  We walked into the building.  I presented him with the bill.  He had questioned the bill.  

I said well, there wasn't much I could do about that at this point.  I wanted to wait for the owner to come by, and he had been a repeat customer.  So I wanted, you know, it's possible we might be able to work something out with him.  [Defendant] wasn't happy with the extent of the bill."

Tower testified that, while the owner was in transit to the shop, he and defendant waited for several minutes before defendant took the keys to the truck and left without paying.

Michael Crimmins, the owner of the shop, testified next.  He testified that, normally, he would have customers sign estimates before, and completion certificates after, any repair work was performed.  Though he did not specify a date, he stated that he had spoken with defendant prior to February 2001.  He described that conversation by saying that "[defendant] had called in reference to the repair, the original, first repair."  He stated that he did not recall if defendant brought his truck in two or three times for the lock problem.  Crimmins stated that he told defendant to bring his truck in to Maaco to have the problem fixed.  He also stated that his shop guarantees its work and that, "if my shop makes a mistake, and we have in the past, I will make it right."  Crimmins stated, "We do warranty work.  If we don't warranty it, we will specifically write on the repair estimate that this has--this is not a warrantied item."  No such notation appears on any repair estimate in this case.

Regarding the events of February 16, 2001, Crimmins said that he was on his way back from a customer's place of business when he learned of defendant's concerns with the repair bill.  He stated that, "[a]bout five to eight minutes later, I was told that *** [defendant] was again inquiring as to how much longer [it would take Crimmins to arrive at the shop to mediate the dispute].  ***  I got another phone call saying that [defendant] had taken the vehicle without paying for it and left."  Crimmins's and defendant's paths crossed as defendant drove away from the Maaco shop, and Crimmins followed defendant and called the police.

Crimmins stated that he attempted to contact defendant several times via telephone after the incident but was unable to reach him.  Crimmins did admit that defendant called Maaco to speak with him at least twice and that, both times, defendant was told that Crimmins was unavailable.  Crimmins did not describe any bill or other documentation sent to defendant after the February incident.

Paula Yeager, defendant's girlfriend, next relayed her version of events.  She testified that she accompanied defendant during his initial trip to Maaco to have the locks changed, but she stated that the first time she went to Maaco was October 2000 (instead of July 19, 2000).  She said that when he dropped off his truck, defendant signed an estimate for the costs of repairs.  She testified that she later drove defendant to Maaco to pick up his truck after the repairs were finished and that he paid in full for the repairs.  She stated that, a few hours after picking up the truck (presumably in October 2000), she and defendant experienced difficulty in opening the truck doors with the new locks.  As Yeager's version of the story continues, she saw defendant call both the sheriff and Tower for assistance with the lockout problem.  Neither was of any help, and, according to Yeager, defendant next called a friend, Bruce Sparacio, to help them get into the truck.  She described the manner in which Sparacio was able to unlock the truck door as follows:

"[F]irst of all, before he did anything, he checked the locks.  They didn't work, and they did proceeded [
sic
] to get into, you know, he went in through the window to get *** the locks so we can get in there."

On cross-examination, she further described the procedure Sparacio used to unlock the truck:

"First of all, he checked the locks before he did anything.  ***  After that, he pushed the window out a little bit, took the--the rubber off, and put a stick in there to--so that he could get in there to unlock it." 

She said that Sparacio pushed what appeared to be a pool stick into the passenger compartment of the truck after peeling the rubber sealing from the window and that the stick never touched the inside of the truck door itself.

According to Yeager, approximately one to two weeks after picking up the truck in October 2000, she and defendant returned to Maaco to have the locks repaired again.  On this visit, she watched as defendant tested the locks on the truck and found that, even after the second repair, there were still "problems" with the locks.  She said that Tower assured them that the "sticking" would work itself out.  She said that Tower never gave defendant a bill during this second visit, nor did he tell defendant that he owed any money for the work.

Yeager then described a third visit to Maaco, in February 2000: "[Tower] met us outside, handed [defendant] the keys, said sorry for the inconvenience, shook his hand, we got into the truck and we left.  The truck was already ready for us in the front."  She said that she never heard Tower or anyone else ask defendant to pay anything for the repairs.  She stated that, after they left the repair shop, defendant was pulled over by police but that they did not arrest him at that time.

Sparacio, defendant's friend, testified next.  He testified that defendant called him "one night" and asked him to assist in unlocking the truck.  He said that, when he arrived, defendant attempted to unlock the driver's-side door of the truck but that "the key just went around."  Sparacio then described, just as Yeager had, the pool cue procedure he used to unlock the truck.  He stated that he did no damage to the door or the lock during the procedure.

Defendant was the last to testify.  He stated that he originally left his truck at Maaco in July 2000 and picked it up in October 2000.  He said that Tower went over all the charges with him in July before he authorized the repairs and that he paid in full when he picked up the truck in October.  He also noted that he signed an estimate in relation to the repair work done on his truck from July until October 2000.  Defendant stated that, after he picked up the truck the first time, in October 2000,  he made two more visits to Maaco to have the truck locks repaired.  He said that he was locked out of his truck hours after initially picking it up from Maaco and that, when he put the key into the driver's-side door, "it spun completely around in a circle."  He described, as Yeager had, his calling the sheriff, Tower, and Sparacio for help unlocking his truck.  He testified that, during his conversation with Tower, Tower told him, "just do whatever you have to do but get it back to the shop, and I'll take care of it."  He described the procedure Sparacio used to unlock the truck in the same way Sparacio and Yeager had.

He testified that he called Maaco soon thereafter but was unable to talk to Tower, who was on vacation at the time.  Defendant stated that he waited until Tower returned from his approximately one-week vacation and contacted Tower again, and that Tower told him that "he would take care of everything."  He said that he took the truck back to Maaco approximately 1½ weeks after first picking it up in October.  Defendant testified that he left his truck at Maaco with Tower and that Tower never asked him to sign anything or mentioned anything about charging him for the repairs.  According to defendant, Tower later called him to say that the locks were improperly installed the first time and that the truck would be repaired correctly once the proper parts arrived.  Defendant said that he went to Maaco to pick up the truck again around November 2000.  At that time, he tested the locks and found that the driver's-side lock still did not function correctly.  He said that Tower assured him that the problem with the lock would "work its way out."  Defendant said that Tower did not charge him for the repair work and that nobody at Maaco presented any type of bill to him.  No bill or other documentation relating to this second visit was entered into evidence.

After some time, defendant said, he contacted Tower again to complain that the driver's-side door lock was still not working properly.  He testified that Tower told him, "just be patient.  You're a re-work job, and if you just be patient, I'll get to you, but I have to do cash jobs first."  Defendant left his truck at Maaco to be repaired a third time, this time, he said, in January or February 2001.  He said that Tower mentioned nothing to him about money relating to that third visit, and Tower gave him no documentation to examine or sign relating to that third visit.

Defendant said that, on February 16, 2001, he went to Maaco to pick up his truck, and Tower handed him the keys without asking that he pay for the newest set of repairs.  He then left Maaco without paying.  Defendant said that nobody from Maaco ever told him that he would be charged for the 2001 repairs on his vehicle and that he was never sent a bill for those repairs.  There is no bill in the record, and the State's witnesses did not testify that they sent defendant a bill.

After deliberating for approximately 2½ hours, the jury returned a verdict of guilty against defendant.  He was sentenced to one year's probation and ordered to pay restitution in the amount of $227.48.

II.  DISCUSSION

Defendant argues that "Crimmins at least should have gone through the motions of billing the defendant and giving him formal notice that his failure to pay the bill could result in the matter being transferred to a collection agency or the filing of criminal charges.  Instead of handling this situation in a responsible fashion, Crimmins essentially used the Du Page County State's Attorney's office as a free collection agency" for a matter that "might go in front of Judge Judy rather than a criminal court."

More specifically, defendant argues that the State presented insufficient evidence to establish beyond a reasonable doubt that he committed all the elements of the alleged crime.  In reviewing the sufficiency of the evidence supporting a criminal conviction, a court of review should consider the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.  
People v. Collins
, 106 Ill. 2d 237, 261 (1985).  Defendant was convicted of theft of labor or services.  "A person commits theft when he obtains the temporary use of property, labor or services of another which are available only for hire, by means of threat or deception or knowing that such use is without the consent of the person providing the property, labor or services."  
720 ILCS 5/16--3(a) (West 2000).

Defendant challenges only that the evidence showed that, when he obtained the repairs without paying, he knowingly did so without Maaco's consent.  Where there is an honest dispute in a defendant's mind as to the rightful cost of services rendered, and the defendant intends to pay the amount he honestly believes is proper at the time he obtains the services, a conviction of theft of services cannot stand.  
People v. Middleton
, 43 Ill. App. 3d 1030, 1037-38 (1976) (applying statute with same language as that considered here).  For the purposes of a theft-of-services conviction, a person obtains services when he "secure[s] the performance thereof."  720 ILCS 5/15--7(b) (West 2000).  Thus, the question here becomes whether, viewing the facts in the light most favorable to the prosecution, the evidence establishes beyond a reasonable doubt that defendant knew that the repair services were not going to be free at the time he secured their performance.

Tower testified, and we take as true, that he called defendant and obtained approval for the repair work.  Tower testified that 
defendant knew he was to be charged for the work, but Tower  never testified that he 
told
 defendant he was going to be charged.  
Further, Tower testified that defendant disputed the bill at the time it was presented and that Tower called Crimmins in an effort to "work something out" to resolve the disagreement.  Crimmins also testified that Tower called and told him that defendant was disputing the bill and that defendant had attempted to contact him via telephone at least two times after the February incident.

There was no testimony or documentary evidence to establish that defendant was told he would have to pay for the repairs, and even Tower's and Crimmins's testimony shows that defendant, through the time he was presented the bill and presumably even to this day, held an honest dispute as to his obligation to pay for the repairs.  Tower's actions--in contacting Crimmins and attempting to assuage the dispute, and in stating his belief that the three men could "work something out"-- support the only reasonable inference that can be drawn from these facts: defendant held an honest dispute as to his obligation to pay, and Tower and Crimmins knew that defendant disputed the bill.  Tower's actions upon defendant's protest of the bill are completely inconsistent with the idea of there being a clear previous understanding that defendant would pay for the repairs.

Likewise, Crimmins's testimony describing the conversation he had with defendant prior to February 2001 strongly supports the conclusion that defendant had an honest dispute regarding the bill.  Crimmins testified that defendant called and referred to the earlier work on the locks and that Crimmins told defendant to bring the truck back to have the problem fixed.  Notably, Crimmins did not testify that he told defendant in this conversation that defendant would have to pay again to have the locks repaired.  

It may be that Crimmins and Tower later concluded, upon examining the locks, that the final repairs were not warrantied because the locks had been damaged after the earlier repairs.  It also may be that Maaco took the truck back with the logical idea of examining the problem before deciding whether to fix the locks as warranty work.  The evidence may be in dispute as to how many times defendant brought the truck back, but, according to Crimmins, defendant had called complaining about prior work.  Tower knew this, but, when he called defendant to obtain authorization for the repairs, he did not tell defendant that they examined the locks and determined that they would not be covered by warranty.  He did not assert that the damage was not Maaco's fault.  He did not testify that he told defendant that a bill would be forthcoming for the repairs.

After the conversation in which Tower failed to inform defendant that a bill would be owing for the newest repairs, the next conversation occurred when defendant came to pick up the truck.  Tower's and Crimmins's testimony regarding this conversation was that defendant was disputing the bill and that Tower called Crimmins to tell him that defendant was disputing the bill.  As explained above, this evidence of Tower's and Crimmins's reaction to defendant's assertion that he did not have to pay for the repairs actually supports rather than undercuts defendant's claim that he honestly disputed the bill.

Our conclusion is further supported by the fact that defendant attempted to contact Crimmins two times after the February incident.  The fact that defendant actively worked to contact the purported victims here 
and the fact that he provided his name, address, and phone number to them on multiple occasions demonstrate that he is hardly a typical "drive away" thief and belie any possible inference that he was trying to abscond without paying what he thought were legitimate fees for services.  

The actions of all the parties involved here allow only for the inference that defendant held an honest dispute regarding Maaco's bill for repairs.  Thus, we hold that, even viewing the facts in the light most favorable to the prosecution, no rational trier of fact could have found that the State proved beyond a reasonable doubt that defendant obtained the repairs knowing that he would be charged for them.

The State offers an alternative rationale for the jury's finding that defendant had no honest dispute as to the cost of the services at the time he obtained them.  The State argues that defendant may have damaged the locks himself when he and Sparacio broke into the truck and thus that he could not have honestly believed that the repair to the locks would be covered by any guarantee from Maaco.  The State supports this theory with Tower's testimony that the locks had been tampered with.  We will take it as true that defendant and Sparacio damaged the locks in October 2000.  However, 
even assuming that defendant and Sparacio damaged the locks, the only reasonable inference from the facts presented is that they did so in order to enter defendant's truck because the door locks were not working properly.  Thus, even if defendant and Sparacio did damage the locks, defendant would have believed that the repairs to the already defective locks would be covered under Maaco's guarantee.  As discussed above, neither Crimmins nor Tower testified that they told defendant anything to dispel this belief.

In short, the State failed to prove beyond a reasonable doubt that defendant knew he was to be charged for the lock repairs when he obtained Maaco's services.  As such, defendant's conviction cannot, and should not, stand.  Frankly, based on the record before us, we are at a loss to understand why criminal charges were even brought and pursued in this dispute.

For the foregoing reasons, the judgment of the circuit court of Du Page County is reversed.

Reversed.

GROMETER and CALLUM, JJ., concur.