# Illinois Official Reports

## Appellate Court

---

### *People v. Walker*, 2017 IL App (2d) 160589

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JANET S. WALKER, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0589 |
| Filed<br>Rehearing denied | September 11, 2017<br>October 17, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 14-CF-1888; the Hon. John J. Kinsella, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel G. Austin, of Austin Law Group, LLC, of Hinsdale, and Terry A. Ekl and Vincent C. Mancini, of Ekl Williams & Provenzale LLC, of Lisle, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Patrick Delfino, Lawrence M. Bauer, Mary A. Fleming, and Lisa A. Hoffman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. |
| | Presiding Justice Hudson and Justice Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1 The defendant, Janet S. Walker, was found guilty of felony theft (720 ILCS 5/16-1(a)(1), (a)(2) (West 2012)) following a bench trial. Walker does not dispute that she exercised unauthorized control over property that did not belong to her, but she argues that she could not be convicted unless the State proved that the victims named in the indictment were indeed the true "owners" of the property at issue. Because there may be several parties who qualify as "owners" under the law and all that is necessary is that the State prove that the named victims had a greater interest in the property than she did, her argument has no merit.

¶ 2                                    I. BACKGROUND

¶ 3 Between 2010 and 2013, Walker was employed by Williamson Management. Williamson Management managed the operations of between 46 and 51 condominium developments (properties) on behalf of the condominium association (CA) boards—collecting assessments from the residents and depositing them into the appropriate CA accounts; taking calls from residents, including requests for maintenance; overseeing vendors and work orders; paying bills; maintaining financial records regarding the CA accounts; and reporting to the CA boards regarding financial matters. Williamson Management employed a total of seven people to manage these properties.

¶ 4 Walker was one such property manager and was responsible for managing between seven and nine properties. As such, she served as the liaison between Williamson Management and the boards of the properties she managed and also between those boards and vendors. She oversaw daily operations, processed bills for payment through the Williamson Management accounting department, prepared budgets, and provided the boards with financial reports at their monthly meetings. The properties Walker managed included Long Valley, Whispering Pines, Briar Hill I and II, and Hidden Glen.

¶ 5 Although Williamson Management collected assessments from residents on behalf of the CAs, the payments were made out to the CA in which each resident lived and were deposited directly into that CA's bank account. Williamson Management served as the conduit for those payments and kept track of them, reporting any delinquencies to the board. Under no circumstances were payments from residents to be made payable to any individual property manager.

¶ 6 Under the agreements executed by the condominium owners, if the owners did not timely pay their assessments, they could be evicted and the units put into foreclosure. The procedure was as follows. First, Williamson Management notified the CA board of the delinquent assessments and sent notices to the resident. If the board decided to proceed with an eviction, it referred the matter to its attorneys, who sent further notices and then filed suit, eventually obtaining an order of possession. At that point, the CA was legally entitled to rent out the

condominium unit while the foreclosure was proceeding and to keep any rent it received as repayment of the unpaid assessments. The CA board generally asked the Williamson Management property manager to oversee the process of finding tenants for the short-term rental of the unit. As this service was outside the property manager's usual duties, the property manager received a commission of one month's rent for performing it. To receive such a commission, the property manager was required to submit a written request. The commission would then be paid by the CA through Williamson Management. In no event was a property manager supposed to receive a commission directly from the renter.

¶ 7    In early 2013, an accounting irregularity came to light in connection with one of the properties managed by Walker: Williamson Management's records reflected a deposit into a CA account, but there was no corresponding deposit shown in the bank records. Williamson Management audited all of the accounts for the properties Walker managed and found several other irregularities, including missing cash, unsupported credits to accounts, and unreconciled items from the bank records of the accounts. In March 2013, Walker and her attorney met with Walker's supervisor, the president of Williamson Management, and Bensenville police detective Brian Dooley. When Walker was confronted with the irregularities, she initially denied that they were in fact irregularities. However, she soon admitted making all but one of the transactions identified. Walker was fired.

¶ 8    In 2014, Walker was charged with theft. The six-count indictment alleged that Walker stole more than $10,000 from Briar Hill II by exercising unauthorized control over the funds (count I) and obtaining the funds through deception (count II), stole more than $500 from Briar Hill I by exercising unauthorized control over the funds (count III) and obtaining the funds through deception (count IV), and stole over $10,000 from various entities listed in an attachment (the CAs of Briar Hill I and II, Hidden Glen, Long Valley, and Whispering Pines) by obtaining the funds through deception (count V) and exercising unauthorized control over the funds (count VI). See 720 ILCS 5/16-1(a)(1), (a)(2) (West 2012).

¶ 9    At trial, State witnesses testified that Walker had rented units to them in the properties listed in the indictment. Specifically, the witnesses testified that they responded to online rental ads that listed Walker as the contact, Walker supervised the rental process, and they signed leases listing Walker as the lessor, and they made money orders or checks for rent payable to Walker, at her instruction. (One exception to this last point was Dan Brennan, who testified that he made his checks payable to Williamson Management. Someone had crossed that out and written "Janet Walker" as the payee; he did not do this or authorize anyone else to do this. Dooley testified that, during his interview with her, Walker admitted to changing the payee on Brennan's checks.) The State also introduced documentary evidence, copies of money orders and checks that witnesses testified they tendered to Walker as rent for their units and bank statements from Walker's two Chase Bank accounts showing that such money orders and checks, totaling at least $80,850, were deposited into her accounts.

¶ 10    The State also produced witnesses who were members of the boards of the CAs named in the indictment. These witnesses uniformly testified that Walker was not authorized to rent out units without the approval of the CA boards and, even if she had such approval, she was not authorized to accept payments of any kind directly from tenants.

¶ 11    The very first witness called by the State was Annette Byrd, Walker's supervisor at Williamson Management. Byrd testified that she had worked in real estate and property management for over 20 years. Among other things, Byrd explained the procedure by which a

CA could gain legal possession of a unit for nonpayment of assessments. In response to a question by the trial court about who owned units where no orders of possession had yet been obtained, Byrd stated that, when a unit had been vacated and was in foreclosure but no order of possession had been issued, the unit could only be rented on a short-term basis. Once the foreclosure was completed and the bank took possession, any rental of the unit would have to end. On cross-examination, the defense attorney pursued this line of questioning. Byrd opined that, if a CA did not have an order of possession to take over a unit, the CA would not be entitled to any rents from that unit. In fact, she agreed that if the CA did not have an order of possession it would have no more right to such rents than the defendant. Instead, any such rents would belong to the owner. However, if the unit were properly rented out, the rents should go to the CA to pay the arrearage on the owner's assessments.

¶ 12     Subsequently, when cross-examining the State's witnesses who were members of CA boards, the defense asked whether each CA had pursued evictions and obtained orders of possession while Walker was serving as property manager for the CA. The answers varied. Georgia Opsahl, a board member of the Briar Hill II CA for 16 years, testified that the CA had initiated eviction proceedings once or twice during Walker's tenure. However, she was not clear on the differences between the legal proceedings for eviction, foreclosure, and bankruptcy. Opsahl believed that, when a bank took over a unit through foreclosure, the bank was required to pay off any arrearage in assessments before it could sell the unit. Mark Timm, a board member for the Hidden Glen CA, recalled that the CA often did sue and obtain orders of possession. He did not know all the units where this had occurred. However, the CA had gotten an order of possession for the unit that Walker rented to Brianna Castelli (one of the witnesses who testified that she rented from Walker and that her money orders and checks for rent, which were made out to Hidden Glen, had "agent Janet Walker" written on them by someone other than her). Kevin Spieles, a board member at Whispering Pines, did not recall that CA ever "took over" any units through legal action. Patricia Rotondi, a board member at Long Valley for 17 years, recalled that in 2010 or 2011 an owner was evicted from a unit. The board agreed to rent it out and asked Walker to obtain a tenant. However, the board never authorized Walker to accept any rent payments from that unit. Rita Minnberg, president of the Briar Hill I board for over 20 years, testified that in 2011 or 2012 a unit went into foreclosure and the owners moved out and handed in their keys to Williamson Management. The CA's attorney told the board that it was okay to take possession of the unit and rent it out to recover unpaid assessments.

¶ 13     At the beginning of the second day of trial, the State tendered five orders of possession for units in Long Valley, Whispering Pines, and Briar Hill, which it wished to submit as evidence. The defense objected on the grounds that the exhibits had not been disclosed earlier and that two of the orders of possession were for units where the tenants either had not testified or had not been able to identify Walker as the person they rented from. Taking the last objection first, the trial court stated that it did not believe that the renters had to testify, as long as the State could show that they rented the units and that their rent money ended up in Walker's accounts. As to the late disclosure, the trial court noted that the documents were tendered in rebuttal to the argument raised the previous day by the defense, which had "opened the door." The trial court also questioned whether the basic premise of this argument—that the CAs did not have any right to the rental proceeds unless they had obtained orders of possession for the units—was a valid defense, commenting that, even if the CAs had not properly perfected their

legal interest in the rental proceeds, "that does not mean that [Walker] had any right to abscond with the proceeds *** for her personal benefit." The trial court suggested that, if the defense itself was not valid, there was no prejudice from allowing the exhibits into evidence. Finally, the orders were public records equally available to both parties and were self-authenticating. For all of these reasons, the trial court ruled that the exhibits were admissible.

¶ 14   The State's last witness was Dooley. Dooley began investigating Walker in 2013 for financial fraud. He reviewed records of her two Chase Bank accounts that had been subpoenaed. He personally prepared People's exhibit No. 8—a summary of the rent checks and money orders deposited into Walker's accounts—and it accurately reflected the information contained in Walker's bank statements. There were 124 such checks and money orders, totaling $80,850. When he interviewed Walker, her attorney was present and she signed a waiver of her *Miranda* rights. Walker denied adjusting Williamson Management's database to hide or falsely show various deposits and denied that the deposits into her accounts were improper. Walker also asserted that she was entitled to all of the money received from a certain tenant, which she estimated totaled less than $2000; in actuality, she received more than $5000 from that tenant. Walker conceded, however, that there was no reason for any tenant ever to write a check directly to her. Dooley also stated that Walker was identified as the lessor on all of the leases he viewed. All of the units at issue were "officially vacant" on Williamson Management records.

¶ 15   After the State rested, the defense moved for a directed finding, arguing that the State had failed to prove that the CAs listed in the indictment actually owned the rental proceeds from the units Walker rented out or that the CAs had any greater interest in those proceeds than Walker herself (who admittedly had no legal interest). The trial court expressed skepticism of this argument in a lengthy discussion, at one point commenting that the situation was akin to money left on a table at a sidewalk café; several parties, including the waiter, the restaurant owner, and the customer who left the money, could all plausibly assert some claim to the money, but all of their interests would be greater than that of someone simply passing by on the sidewalk, who (like Walker) would have no legal right to the money. The trial court denied the motion for a directed finding. After the trial court admonished Walker about her right to testify and she declined to do so, the defense rested. The parties gave closing arguments, during which the defense repeated its same argument about ownership.

¶ 16   The trial court found Walker guilty on all counts. Walker's motion to reconsider or, in the alternative, for a new trial was denied. The trial court merged the convictions into a single charge—theft by unauthorized control of an amount greater than $10,000—and sentenced Walker to 60 days' periodic imprisonment (work release from the county jail), three years' probation, restitution in the amount of $80,850, and fees and costs.

## II. ANALYSIS

¶ 18   On appeal, Walker repeats her argument that the State did not prove its case against her because it did not show that the CAs had taken the steps necessary to obtain legal possession of the units she rented out and thus that they had any greater rights to the rental proceeds from those units than she. She argues that, in the absence of those procedures, only the owners of the units could have been victims of her theft, not the CAs named in the indictment.

¶ 19   Defendants have often challenged their theft convictions when the victim named in the charging instrument was different than the person or entity shown at trial to be the property's

owner on the ground that this variance between the charge and the proof at trial prejudiced their ability to present a defense. See, *e.g.*, *People v. Bristow*, 8 Ill. App. 3d 805, 807-08 (1972). Here, however, Walker expressly disavows any "variance" argument. Instead, she argues that the State failed to prove that the CAs named in the indictment were actually "owners" of the rental proceeds and that this failure means that the evidence was insufficient to sustain her conviction of theft. There is no merit to her argument.

¶ 20 In evaluating the sufficiency of the evidence, it is not the province of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*; *People v. Mills*, 356 Ill. App. 3d 438, 444 (2005). The determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991); *Collins*, 106 Ill. 2d at 261. This standard applies whether the evidence is direct or circumstantial and whether the verdict is the result of a jury trial or a bench trial. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 21 According to the law under which Walker was charged,

"(a) A person commits theft when he or she knowingly:

(1) Obtains or exerts unauthorized control over property of the owner; or

(2) Obtains by deception control over property of the owner ***." 720 ILCS 5/16-1(a)(1), (a)(2) (West 2012).

The term "owner" is defined in section 15-2 of the Criminal Code of 2012 (Code) (720 ILCS 5/15-2 (West 2012)) as "a person, other than the offender, who has possession of or any other interest in the property involved, even though such interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property." This definition is broad, treating the term "owner" as encompassing a variety of interests, not just legally perfected property rights. "A possessory interest for the purposes of describing a criminal violation is not the same as a possessory interest as defined by traditional property law standards." *People v. Rothermel*, 88 Ill. 2d 541, 547 (1982).

¶ 22 The elements of theft are twofold. "To prove the offense, it need only be shown [(1)] that someone other than the accused possessed or held an interest in the property and [(2)] that the accused was unauthorized in exerting control over that property." *In re W.S.*, 81 Ill. 2d 252, 257 (1980). In *W.S.*, the defendant was charged with stealing several leather jackets that were alleged to be the " 'property of Jean Nicole, a corporation.' " *Id.* at 253-54. The evidence at trial established that the store from which the jackets were taken was named "Jean Nicole," but the only evidence offered regarding the identity of the corporate owner of the store (and the jackets) was hearsay. Further, the hearsay evidence suggested that the corporate owner was not "Jean Nicole" but was instead a corporation of a different name. *Id.* at 255. The defendant argued that the evidence was insufficient to support his conviction because the State had not proved the corporate existence of the owner. The supreme court rejected this argument, finding that the State had proved that the jackets belonged to someone other than the defendant and that the defendant had taken them without authorization and thus his conviction of theft was supported by sufficient evidence. *Id.* at 259.

¶ 23    Similarly, over a century ago, the supreme court upheld a theft conviction even though the woman identified as the owner in the charging document had not completed all of the steps necessary to prove title to the property. See *People v. Frankenberg*, 236 Ill. 408 (1908). Although she might not have perfected her title, she still had an interest in the property sufficient to support the conviction. *Id.* at 414.

¶ 24    As the supreme court has noted, over time, Illinois law has "moved away from defining a possessory interest in the criminal law context as having a real or personal interest in property to a definition that requires only that the interest be greater than that of the defendant." *Rothermel*, 88 Ill. 2d at 547. For instance, the court had held that the definition of "owner" was broad enough to include a security guard employed by the owner of a store damaged by a defendant. *Id.* at 546-47 (citing *People v. Tate*, 87 Ill. 2d 134 (1981)). Illinois courts have also upheld theft convictions where the "owner" identified in the charging instrument exercised control over the property only as a bailee (*People v. Hansen*, 28 Ill. 2d 322 (1963); *People v. Demos*, 3 Ill. App. 3d 284 (1971)), as an employee of the actual owner (*People v. Smith*, 90 Ill. App. 2d 388 (1967)), or even as an FBI informant whose temporary interest in the cash provided to him for use in paying off the defendant was sufficient to qualify him as an "owner" (*People v. Kaye*, 154 Ill. App. 3d 562 (1987)). As this case law makes clear, "[a] theft indictment need not allege the legal title holder as 'owner.' " *People v. Woods*, 15 Ill. App. 3d 221, 224 (1973). Rather, it must simply allege ownership by "an entity capable of possession." *Id.* And, so long as the State proves that someone other than the defendant had a greater possessory interest in the property, the evidence is sufficient to support a conviction of theft. *Rothermel*, 88 Ill. 2d at 547.

¶ 25    In arguing otherwise, Walker relies on *People v. Holloway*, 90 Ill. App. 3d 1098 (1980), a burglary case. There, the indictment alleged that the building that the defendant was charged with entering unlawfully was in the "care, custody and control" of the director of the county housing authority. *Id.* at 1099. However, at trial, the director testified that the portion of the building entered by the defendant was leased to a Head Start day care center. *Id.* The appellate court reversed the defendant's burglary conviction on the ground that the State had failed to prove that the defendant did not have authority to enter that portion of the building because the owner listed in the indictment had given such authority to the lessee and the lessee did not testify. *Id.*

¶ 26    We do not find *Holloway* persuasive for several reasons. First, it was decided before *Rothermel*, which rejected its emphasis on the formalities of legal possession, and the supreme court has cast doubt on its continued vitality. See *People v. Holloway*, 92 Ill. 2d 381, 383 (1982) (appeal in a related case, noting that the appellate decision in *Holloway* had not been appealed and thus its correctness was not before the supreme court; however, that appellate decision preceded *Rothermel*, in which the supreme court "held that a daughter's possession of a key to her mother's house was sufficient to demonstrate an interest greater than that of the defendant and was therefore an adequate allegation of a possessory interest in an indictment for burglary"). Second, the appellate court's reversal in *Holloway* was based on its determination that the variance between (a) the entity identified in the indictment as having control over the building and (b) the proof at trial regarding such control was "such a significant variance as to warrant a reversal." *Holloway*, 90 Ill. App. 3d at 1099. Here, however, Walker has declined to raise any variance argument, and the holding of *Holloway* is not applicable to her argument on the different legal issue of the sufficiency of the evidence.

¶ 27    In this case, the evidence clearly showed (and Walker does not dispute) that she had no legal authority to receive and retain control of the proceeds from the rental of condominium units. To sustain her conviction of theft, the only other thing the State was required to prove was that someone else had a greater interest in the property than she. See *W.S.*, 81 Ill. 2d at 257 ("To prove the offense [of theft], it need only be shown that someone other than the accused possessed or held an interest in the property and that the accused was unauthorized in exerting control over that property."); see also *Rothermel*, 88 Ill. 2d at 547 ("a possessory interest in the criminal law context *** requires only that the interest be greater than that of the defendant"). Walker asserts that, with respect to the units for which the CAs had *not* obtained orders of possession, the former owners of the units had the sole right to receive any rents. This assertion amounts to a concession that someone other than she (the owners) had a greater interest in the rental proceeds. Even if she had not made this concession, however, the evidence established that the named victims of her theft (the CAs) had at least a contingent interest in those proceeds. The CAs were entities "capable of possession" of the units (*Woods*, 15 Ill. App. 3d at 224), but Walker could not assert *any* possessory interest in the units. Thus, the evidence was sufficient to support her conviction of theft of the proceeds from renting those units.

¶ 28    As to the units for which the CAs *had* obtained orders of possession, the possessory interests of the CAs were even more strongly established. On appeal, Walker argues that the CAs' interests were not perfected because there was no evidence that the orders of possession had been placed with the sheriff for execution. However, the trial court could infer that all of the units had been abandoned by their former owners or else Walker would not have been able to rent them out. As noted by CA board president Minnberg in her testimony, the CA's attorney advised the board (accurately, in our opinion) that the CA could legally assert possession over—and rent out—a unit whose owner had abandoned it and turned in the keys. Walker has not cited any legal authority establishing that the sheriff must execute an order of possession to transfer legal possession even where the unit is abandoned. And even if such authority existed, the perfection of the CAs' property interests was not required; all that was required was evidence of their superior rights to the rental proceeds, which was unquestionably presented. We reject Walker's assertion that the evidence did not adequately support her conviction.

¶ 29    Walker also raises a related argument that at most she should have been convicted of misdemeanor theft rather than a felony because the State did not prove that the CAs had possessory interests in all of the $80,850 of rental proceeds found in her bank accounts. She points to the testimony that the CAs were entitled to rental proceeds from vacated units only to the extent of any arrearages for unpaid assessments and argues that the State failed to show how large the arrearages were for the units she rented out. She suggests that the money actually owed to the CAs for such arrearages could have been less than $500, in which case the State would have proved only that she committed a misdemeanor, not a felony. See 720 ILCS 5/16-1(b)(1) (West 2012).

¶ 30    This argument suffers from the same flaw as her previous argument: to convict her of felony theft, the State did not need to prove that the victims named in the indictment (the CAs) were legally entitled to more than $10,000 of the rental proceeds. Rather, the State was required to prove only that (1) Walker took (or exercised unauthorized control over) more than $10,000 in funds and (2) someone other than Walker held a superior possessory interest in those funds. See *W.S.*, 81 Ill. 2d at 257; see also *Rothermel*, 88 Ill. 2d at 547. The State showed

that Walker had deposited into her personal bank accounts 124 checks and money orders totaling $80,850, all of which were rent payments for units that Walker had no authority to rent out, much less to accept payments for in her own name. The State thus proved the first element, unauthorized exercise of control of more than $10,000. And, as noted above, there was also sufficient evidence that someone other than Walker (either the CAs or the owners) held a greater possessory interest in the funds. Walker was properly convicted of felony theft rather than a misdemeanor.

¶ 31 Walker's final argument is that the trial court abused its discretion in admitting into evidence the State's exhibits (orders of possession) that were not disclosed until the second day of trial. We review a trial court's rulings regarding discovery issues, as well as its evidentiary rulings, for abuse of discretion. *Reda v. Advocate Health Care*, 199 Ill. 2d 47, 54 (2002); *People v. Sutton*, 349 Ill. App. 3d 608, 615 (2004). A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or no reasonable person would take the view adopted by the trial court or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 32 Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) requires the State to disclose to the defendant the evidence it intends to introduce at trial. However, where rebuttal evidence is concerned, the State need not inform the defendant about the evidence until it forms the intent to introduce the evidence. "The reason for this rule is that a prosecutor cannot know whether a witness will be called [or documentary evidence will be submitted] in rebuttal until the defense testimony is heard." *People v. Pitts*, 104 Ill. App. 3d 451, 457 (1982). When a defendant asserts that the trial court abused its discretion by refusing to exclude previously undisclosed rebuttal evidence, the defendant must show prejudice arising from the admission of the evidence. *People v. Galindo*, 95 Ill. App. 3d 927, 933 (1981).

¶ 33 The undisclosed exhibits about which Walker complains were orders of possession obtained by some of the CAs named in the indictment. Walker argues that she was prejudiced by their admission because, in her eyes, if the State had not submitted these exhibits, it would have been unable to prove her guilty of theft. But Walker's premise is incorrect. As discussed above, the State was not required to prove that the CAs held perfected interests in the rental proceeds. Rather, it simply had to offer evidence that the CAs (or anyone other than Walker) had superior possessory rights to those proceeds. *Rothermel*, 88 Ill. 2d at 547. The testimony of the State's witnesses established that the CAs had contingent interests in rental proceeds from the units and were "capable of possession" (*Woods*, 15 Ill. App. 3d at 224), thereby satisfying that requirement. Moreover, Walker herself concedes that the owners had interests in the proceeds if the CAs did not and that she had no legitimate interest in the proceeds. Thus, the undisclosed rebuttal exhibits were largely irrelevant to the proceedings, and Walker was not prejudiced by their admission. We find no error in the trial court's ruling on this issue.

¶ 34                                   III. CONCLUSION

¶ 35 For the reasons stated, the judgment of the circuit court of Du Page County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 36 Affirmed.