2021 IL App (2d) 190925-U
No. 2-19-0925
Order filed May 5, 2021
Modified upon denial of rehearing June 2, 2021.

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Boone County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12-CF-248 |
| | ) | |
| MARY R. BARNES, | ) | Honorable |
| | ) | Philip J. Nicolosi, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant forfeited her first argument by failing to raise it in the trial court; trial court did not abuse its discretion in allowing the admission of certain medical records as business records; and evidence was sufficient to support the defendant's conviction.

¶ 2    A jury convicted the defendant, Mary Barnes, of one count of aggravated driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2), (d)(1)(A) (West 2010)).  She appeals, arguing that the results of the blood test taken on the night of her accident should not have been admitted under the hearsay exception for business records and that the evidence of impairment was insufficient to support her conviction.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On October 4, 2012, the defendant was involved in a single-car rollover accident near Route 20. The first person to arrive on the scene was Zachary Burden, a passer-by who saw taillights off to the side of the road and came to investigate. The defendant's car was upside down in a ditch with the headlights on. The windows were closed and unbroken. The defendant did not appear to be hurt, although Burden thought she looked "confused." When Burden asked if she was okay, the defendant held up a bottle and asked him if he could help her "get rid of this alcohol." Burden did not want to do that and returned to the roadside, where he waited until the police arrived. He spoke with the police and then left.

¶ 5      Edward Krieger, a sergeant with the Boone County Sheriff's Department, arrived at the scene about 1:45 a.m. The defendant's Subaru was in a ditch with all four wheels in the air. After the defendant was out of the car, he searched it before it was towed. He found a 750 ml cognac bottle with the seal broken and about a half ounce of liquid in it. The liquid smelled like alcohol. He did not keep the bottle because it was not procedure to keep open bottles of alcohol as evidence. He did not prepare a report, and at trial he testified from his own memory.

¶ 6      Deputy Sheriff Rich McGill arrived at the scene about the same time as Krieger. He spoke with Burden while the defendant was extricated from the car. McGill then spoke with the defendant from the back of the ambulance while she was in it. He noticed an "odor of alcoholic beverage throughout the whole back of the ambulance." The defendant told McGill that she crashed because she swerved to avoid a deer. McGill asked her repeatedly how much she had had to drink. The first time she did not answer. The second time she instead asked the paramedic about her blood pressure. The third time, McGill asked her if it was "a lot or a little." The defendant said that "the amount is subjective and four beers is a lot." When McGill asked her

again how much she had had to drink, she said she had had three beers. He asked her if she felt "buzzed or drunk." She replied that she "didn't feel right." The defendant told McGill that there was alcohol in her car, but it was her boyfriend's and she was returning it to him. The defendant's eyes were not glassy or bloodshot, and her speech was not slurred. He did not ask her to perform any field sobriety tests because she was being treated by paramedics and she had already admitted consuming alcohol.

¶ 7     Paramedic Lisa Liebgott responded to the scene. The defendant was conscious and able to answer questions. The defendant said she was not injured. She was not sure if she had lost consciousness. Because of the possibility of neck injury, Liebgott told her not to move while the paramedics looked for a way to get her out of the car. However, the defendant ignored her and climbed out the hatchback. Once the defendant was out of the car, the paramedics placed her on a backboard and in a cervical collar, and transported her to the ambulance on a gurney. The defendant had some slight abdominal pain but no obvious injuries. Her breath smelled of alcohol and she said that she had had a few drinks. However, she did not slur her words and she could converse coherently. Liebgott generated a Glasgow Coma Score (used to preliminarily assess the possibility of head injury) based upon her evaluation of the defendant; the defendant had a "perfect score" of 15.

¶ 8     The defendant did not want to go to the hospital, but after the paramedics explained that she should be checked out in case she had injuries she did not know about, she agreed to be transported. Although she was generally calm, the defendant refused an IV and other treatment by the paramedics.

¶ 9     Nurse Vincent Superticioso was working in the emergency room of OSF St. Anthony's Hospital when the defendant was brought in. He was her primary care nurse that night. He noticed

a strong smell of alcohol, and the defendant admitted that she had consumed alcohol but would not say how much. The defendant's demeanor became more agitated and belligerent over time. She refused to consent to a CT scan and shouted obscenities at the hospital staff.

¶ 10    Superticioso was a trained trauma nurse, and there were certain protocols that were followed in all trauma cases. They would first start an IV line. Then they would draw blood. All actions taken would be charted in the patient's medical records, which were kept in the ordinary course of business and were relied upon to treat the patient. The records reflected that the defendant was brought in at 2:34 a.m. Her blood was collected at 2:40, although the order to do so was not recorded until 2:53 a.m. There was no indication who drew the blood, and he did not recall anything about the blood draw. The blood was tested at the laboratory on the first floor of the hospital where all of the emergency room blood draws were tested.

¶ 11    Dr. Andrew Hoffman treated the defendant in the emergency room. Although she was awake and responsive when she arrived, she was "not able to fully reason." She allowed her blood pressure to be taken but resisted other attempts to treat her. In his experience, people with internal injuries were not always aware of their injuries. A "perfect score" on the Glasgow coma test did not mean that there was no head trauma. As part of their standard protocol with trauma patients, Hoffman ordered a blood test, including a test for alcohol content. Hoffman also decided that the defendant needed a CT scan because of the possibility of severe head injury, but the defendant would not agree and grew increasingly belligerent. She also refused to have her vital signs taken or x-rays of her chest or pelvis. By about 3 a.m., when the defendant began thrashing in an attempt to rise, Hoffman decided that, based on her limited ability to reason and the possibility of a potentially fatal head injury, she should be sedated. Based on the records, it was possible that her blood had been drawn after she was sedated.

¶ 12    McGill arrived at the hospital after the defendant had arrived.  He did not see her, but could hear her yelling.  He waited and was eventually given the results of the defendant's blood test, which was "327."  He was surprised because, in his experience, usually someone with a blood alcohol concentration that high would not be able to converse coherently and without slurring their words.  However, he had seen hundreds of impaired people and they did not always present the same set of indicators.  He had seen people with a high blood alcohol concentration who did not slur their words and who functioned normally.  Based upon the nature of the crash, the odor of alcohol surrounding the defendant, her evasive responses to his questions, and her combative actions at the hospital, McGill believed that the defendant was impaired and unfit to operate a motor vehicle.

¶ 13    The defendant was charged with two counts of aggravated DUI, based in part on her two prior convictions of DUI.  One count alleged that she drove while impaired and under the influence of alcohol; the other count alleged that she drove when her blood alcohol concentration was above 0.08.

¶ 14    At trial,[1] the State presented the above witnesses.  The defense briefly recalled McGill, whose testimony is summarized above.  It also called two other witnesses: Ronald Henson, Ph. D., an expert in behavioral manifestations of alcohol and blood alcohol collection and analysis, and the defendant.

¶ 15    Henson criticized the blood draw procedure and test results at length, opining that they were not reliable for several reasons, including that the medical records did not reflect who drew

---

[1] For various reasons, the defendant's trial was delayed by several years.  No issue regarding the delay is raised here.

the blood or performed the test, and the lack of a chain of custody. He also testified that the defendant would necessarily have been slurring her words if her blood alcohol concentration had in fact been 0.327 and opined that, based on the witnesses' observations and reports, she was not under the influence of alcohol when she drove.

¶ 16    The defendant testified that she had consumed three beers over the course of three hours on the evening before her accident. The accident occurred when she swerved to avoid a deer. She had not had anything to drink from the bottle in the car, which belonged to her ex-boyfriend and which she was returning to him. She was not injured in the accident. She refused the recommendations of hospital staff to get X-rays or a CT scan because she had had cancer and did not want to undergo any more radiation. She worked as an x-ray technician but was not concerned about radiation at work because she could take precautions to avoid radiation there.

¶ 17    The jury acquitted the defendant of the count alleging that her blood alcohol concentration was above 0.08 and found her guilty of the count alleging that she was under the influence of alcohol when she drove. The trial court sentenced her to 90 days' periodic imprisonment and 48 months of probation. Her posttrial motion and motion to reconsider sentence were denied. This appeal followed.

¶ 18                                    II. ANALYSIS

¶ 19    The defendant raises three arguments on appeal: two related to the admission of her hospital blood test results under the hearsay exception for business records, and an argument about the sufficiency of the evidence of impairment.

¶ 20                   A. Admission of Blood Test Results as Business Records

¶ 21    Hearsay is an out-of-court statement that is offered to establish the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011); *In re Estate of DeMarzo*, 2015 IL App (1st)

141766, ¶ 19. The statement may be written, such as the blood test results at issue here, or verbal. Hearsay is inadmissible unless the statement falls within a hearsay exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011); *Estate of DeMarzo*, 2015 IL App (1st ) 141766, ¶ 19.

¶ 22    As noted, the trial court allowed evidence of the results of the blood tests performed by the hospital to be admitted under the business records hearsay exception. Section 11-501.4(a) of the Illinois Vehicle Code (Code) (625 ILCS 5/11-501.4(a) (West 2016)) provides that, in prosecutions under the DUI laws, the results of blood tests to determine an individual's blood alcohol levels that were "conducted upon persons receiving medical treatment in a hospital emergency room are admissible in evidence as a business record exception to the hearsay rule" so long as the tests: (1) "were ordered in the regular course of providing emergency medical treatment and not at the request of law enforcement authorities," and (2) "were performed by the laboratory routinely used by the hospital." The defendant argues that the trial court's ruling allowing the admission of her blood tests results under this statute was error, for two reasons.

¶ 23    First, she argues that her blood test results could not be admitted at all pursuant to section 11-501.4, because that statute conflicts with Illinois Supreme Court Rule 803(6), which codifies the business records exception to the hearsay rule. Rule 803(6) provides that records "kept in the course of a regularly conducted business activity" that were made near the time of the act or event recorded by a person with knowledge are exceptions to the hearsay rule and may be admitted into evidence, "[e]xcept for medical records in criminal cases." Ill. S. Ct. R. 803(6) (eff. Sept. 28, 2018). The defendant argues that the phrase "except for medical records in criminal cases" indicates that blood test results cannot be admitted as business records in DUI prosecutions. She also notes that, if a statute regulating the admission of particular evidence irreconcilably conflicts with a supreme court rule regarding the same issue, the statute must give way to the rule (*People*

*v. Peterson*, 2017 IL 120331, ¶ 31), and she argues that section 11-501.4 irreconcilable conflicts with Rule 803(6).

¶ 24    Although this court has not yet addressed the issue, the First and Third Districts of the Illinois Appellate Court have directly considered, and rejected, the defendant's argument.  See *People v. Hutchison*, 2013 IL App (1st) 102332, ¶ 24 (noting that section 11-501.4 was enacted well before the adoption of the Illinois Rules of Evidence and the committee comments to those rules expressly state that the rules were "not intended to abrogate or supersede any current statutory rules of evidence"); *People v. Turner*, 2018 IL App (1st) 170204, ¶ 72 (considering and rejecting the argument that *Peterson* overruled or undermined the holding of *Hutchison*); *People v. Deroo*, 2020 IL App (3d) 170163, ¶ 44 (adopting *Hutchison*'s approach), *appeal allowed*, 2020 IL 126120 (order dated Sept. 30, 2020).  We need not delve into the correctness of their approach, however, because the defendant failed to raise this argument in the trial court and thus it is forfeited.

¶ 25    "It is well settled in Illinois that an appellant who fails to raise an issue before the trial court forfeits the issue and may not raise it for the first time on appeal." *Williams v. Bruscato*, 2019 IL App (2d) 170779, ¶ 24.  "The purpose of the forfeiture rule 'is to encourage parties to raise issues in the trial court, thus ensuring both that the trial court is given an opportunity to correct any errors prior to appeal and that a party does not obtain a reversal through his or her own inaction.' " *Id*. (quoting *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14). Here, the defendant did not argue before trial, during trial, or in her posttrial motion, that her blood test results were not admissible because they were inescapably barred by Rule 803(6).  To the contrary, although the defendant discussed the applicability of Rule 803(6) in her posttrial motion, she argued that both that rule and section 11-501.4 applied to the admission of blood test results as business record.  The clear implication of this argument was that Rule 803(6) and section

11-501.4 operate in tandem to govern the admissibility of blood test results in DUI cases. We therefore find her current argument on appeal—that the rule irreconcilably conflicts with the statute and bars any admission of the results at all—forfeited.

¶ 26    We turn to her second argument regarding the admissibility of her blood test results: that the State did not lay a proper foundation for their admission as business records under the statute. The defendant argues that the State did not establish that the laboratory that performed the blood tests was "routinely used by the hospital," as required by section 11-501.4(a)(2). She also argues that the record of the test results was not reliable for a variety of other reasons.

¶ 27    The determination of whether evidence is admissible is within the sound discretion of the trial court, and we will not reverse that determination unless there has been a clear abuse of its discretion. *People v. Montano*, 2017 IL App (2d) 140326, ¶ 74. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 28    The defendant's argument about the laboratory is easily disposed of. First, it was forfeited: the defense attorney never objected to the admission of the blood test results on the basis that the hospital's routine use of its own laboratory was not established. Second, even if we were to consider the argument, it has no merit. Superticioso testified that the defendant's blood was sent to the hospital laboratory, which was located on the ground floor of the hospital. He further described the general procedure for blood tests, which included drawing the blood, labeling the vial with the patient's information, and sending it to the hospital lab. The lab would post the results within a half hour to an hour. Although this testimony does not explicitly state as much, it was sufficient to support a reasonable inference that the hospital routinely used its own lab to test blood.

¶ 29    The defendant also argues that the blood test results were not reliable, for a variety of reasons: the hospital's records did not show who drew the blood, and the records were contradictory regarding when the blood was drawn, as the records state that the blood was drawn at 2:40 a.m., but the order to draw the blood was not recorded as being given until 2:53 a.m., and Dr. Hoffman testified that it was possible that the blood was not drawn until after the defendant was sedated at about 3 a.m. However, under section 11-501.4, there are only two requirements for the admission of blood test results in DUI cases: that the tests were ordered not by the police but by the medical staff for use in providing emergency medical treatment to the defendant, and the tests were performed at a laboratory routinely used by the hospital. Both of those requirements were met here. Accordingly, the trial court did not abuse its discretion in admitting the test results. All other arguments regarding the reliability of the tests go only to the weight to be given to the test results, not their admissibility. *Hutchison*, 2013 IL App (1st) 102332, ¶ 21. The defendant presented substantial evidence regarding the unreliability of the blood test results to the jury, and thus the jurors were well aware of her arguments. We do not sit as a second jury and will not reweigh the evidence on appeal. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 30    Lastly, any error in the admission of the blood test results—even if the defendant had not forfeited her arguments regarding the applicability of Rule 803(6) and whether the hospital "routinely" used its own lab to test blood—was harmless. The jury here rejected any reliance on those results, deciding to acquit the defendant of the count that required proof of her blood alcohol concentration. This is a clear indication that the jury did not take the blood test results into account when convicting the defendant of the remaining count, which was based on impairment alone. An evidentiary issue is harmless when no reasonable probability existed that the jury would have acquitted the defendant absent the error. See *In re E.H.,* 224 Ill. 2d 172, 180 (2006). As any error

in the admission of the blood test results was harmless, we do not address the defendant's assertion that we should consider her forfeited arguments under the plain error doctrine. See *People v. Leach*, 2012 IL 111534, ¶ 141 ("if an error was harmless, it most certainly cannot rise to the level of plain error").

¶ 31    For all of these reasons, we reject the defendant's arguments regarding the admission of the blood test results under the hearsay exception for business records. As the trial court did not abuse its discretion in admitting the blood test results, its decision to allow testimony about those results (which included the testimony of the defendant's own expert) likewise was not an abuse of discretion.

¶ 32                    B. Sufficiency of the Evidence of Impairment

¶ 33    The defendant's final argument is that the evidence of impairment was insufficient to prove her guilty beyond a reasonable doubt of aggravated DUI. In evaluating the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins,* 106 Ill. 2d at 261; *People v. Mills*, 356 Ill. App. 3d 438, 444 (2005). The determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991); *Collins,* 106 Ill. 2d at 261. We will set aside a criminal conviction only "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 34    The defendant's conviction was based upon the jury's finding that she drove while she was under the influence of alcohol. "A person is under the influence of alcohol when, as a result of drinking any amount of alcohol, his mental or physical faculties are so impaired as to reduce his

ability to think and act with ordinary care." *People v. Bostelman*, 325 Ill. App. 3d 22, 34 (2001) (quoting Illinois Pattern Jury Instructions, Criminal, No. 23.29 (4th ed. 2000)). "Circumstantial evidence may be used to prove this; further, the testimony of a single, credible police officer may alone sustain a conviction of DUI." *People v. Tatera*, 2018 IL App (2d) 160207, ¶ 25.

¶ 35    Here, McGill testified that, in his opinion, the defendant was impaired when she drove, based not only on the odor of alcohol on her breath but also on the rollover crash itself, the defendant's evasiveness when he asked her about her drinking, and her escalating behavior at the hospital. The defendant's conviction could be sustained on the basis of this testimony alone. *Id*. However, the State introduced other evidence of the defendant's impairment as well: Burden's testimony that she appeared confused; Dr. Hoffman's testimony that she did not "seem to reasonably understand the issues involved"; her yelling and cursing at medical staff; and the impaired judgment reflected in her decisions to: respond to Burden's questions about her safety by asking him to help her get rid of alcohol, climb out of her car through its hatchback despite Liebgott's instructions not to move, and refuse diagnostic measures needed to ensure that she did not have a head injury. Taken together, this evidence was not "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt" that she was impaired. *Smith*, 185 Ill. 2d at 542.

¶ 36    The defendant emphasizes her own testimony, which attempted to provide an alternate explanation for the evidence of impairment described above. However, it was the jury's job to weigh her credibility against that of the other witnesses who presented evidence of her impairment, and we have no basis to second-guess their determination. *Collins*, 106 Ill. 2d at 261. The evidence was sufficient to sustain her conviction.

¶ 37                               III. CONCLUSION

¶ 38    For the reasons stated, the judgment of the circuit court of Boone County is affirmed.

¶ 39   Affirmed.